233 N.J. Super. 1 (1989)
558 A.2d 1
TOWNSHIP OF BERNARDS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF COMMUNITY AFFAIRS, AND NEW JERSEY COUNCIL ON AFFORDABLE HOUSING, DEFENDANTS-RESPONDENTS.
IN THE MATTER OF THE RULES PROMULGATED BY THE NEW JERSEY COUNCIL ON AFFORDABLE HOUSING N.J.A.C. 5:92-1.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 1989.
Decided April 5, 1989.
*6 Before Judges DREIER, HAVEY and BROCHIN.
Howard P. Shaw argued the cause for appellant Township of Bernards (Schenck, Price, Smith & King, attorneys; James E. Davidson and Howard P. Shaw on the brief).
Ralph J. Kmiec, argued the cause for appellant Township of Cherry Hill (Ralph J. Kmiec, on the brief).
Geraldine Callahan, Deputy Attorney General argued the cause for respondents Department of Community Affairs and New Jersey Council on Affordable Housing (Peter N. Peretti, Jr., Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Geraldine Callahan and Donald M. Palombi, Deputy Attorneys General, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*7 The Township of Bernards [Bernards] and the Township of Cherry Hill [Cherry Hill] appeal from the promulgation of rules by the New Jersey Council on Affordable Housing [COAH]. See N.J.A.C. 5:92-1 thru 17.3. Both Bernards and Cherry Hill contest the validity of N.J.A.C. 5:92-6.1. Bernards also contests sections 8.4(c) and 8.5(f), but asserts that the objectionable portions of the rules may be deleted without detriment to the remaining rules. Cherry Hill argues against sections 8.3(a) and (b) as well as factors employed in the formula for determining a municipality's fair share of its region's low and moderate income housing. It further claims that those two rules and factors were adopted in violation of the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq. As the two townships are contesting the same body of rules, we consolidated the oral argument in these cases, and further consolidate the appeals for the purpose of this opinion.
In 1975 and 1983 the New Jersey Supreme Court issued two landmark opinions in the area of low and moderate income housing: Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 67 N.J. 151 (1975), app. dism. and cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) [Mt. Laurel I], and Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel Tp., 92 N.J. 158 (1983) [Mt. Laurel II]. In Mt. Laurel I the Court held that a developing municipality has a constitutional obligation to provide, by means of its land use ordinances, its "fair share" of housing for the low and moderate income citizens of its region. Mt. Laurel I, 67 N.J. at 174. Mt. Laurel II expanded the Mt. Laurel I decision, stating that this constitutional obligation meant not only that each municipality had to provide for the present need for such housing in its region, but also that all municipalities had to provide for the region's future need as well. Mt. Laurel II, 92 N.J. at 218-219. Remedies, including the "builder's" remedy, were established. Id. at 278-292. Mt. Laurel II also instituted a procedure by which *8 claims against municipalities could be adjudicated before specially designated judges. Id. at 292-293.
In response to this judicial treatment, and at the direct invitation of the Court, 92 N.J. at 213, on July 2, 1985 the New Jersey Legislature adopted the Fair Housing Act [Act]. N.J.S.A. 52:27D-301 et seq. The Legislature's response explicitly acknowledged the court's deference to legislative treatment, N.J.S.A. 52:27D-302b. The Act's constitutionality was upheld in Hills Development Co. v. Bernards Tp., 103 N.J. 1, 25 (1986).
The Act established a Council on Affordable Housing to administer its provisions. N.J.S.A. 52:27D-305. COAH's purpose was, inter alia, to determine what constituted a municipality's "fair share" of low and moderate income housing. N.J.S.A. 52:27D-307. To that end COAH promulgated administrative regulations, codified at N.J.A.C. 5:92-1 et seq. These regulations define each region's total low and moderate income housing needs and the methodology for allocating this housing among the communities of the region. Plaintiffs in these two appeals are contesting the validity of some of those rules pursuant to R.2:2-3(a)(2).
All the issues in these cases require us to review COAH's exercise of its rule-making power. The standards for review of such rule-making are three-fold. First, if the rule is not arbitrary, capricious, unreasonable or irrational, it will be upheld. Bergen Pines v. New Jersey Dept. of Human Services, 96 N.J. 456, 477 (1984); In re Medicaid Long-Term Care Services Bulletin 84-2, 212 N.J. Super. 48, 57-58 (App. Div. 1986), certif. den. 107 N.J. 31 (1986). Second, the rule must carry out the will of the legislature. Hotel Suburban System, Inc. v. Holderman, 42 N.J. Super. 84, 91 (App. Div. 1956). The regulation must fall within the express or implied grant of power to the agency in the enabling legislation. A.A. Mastrangelo, Inc. v. Comm'r. Dept. of Envir. Protect., 90 N.J. 666, 683-684 (1982); Hills Development v. Bernards Tp., 229 N.J. *9 Super. 318, 340 (App.Div. 1988). However, a specific grant of authority is to be liberally construed, In re Cable Television, 132 N.J. Super. 45, 48-49 (App. Div. 1974), certif. den. 67 N.J. 95 (1975), unless there is reasonable doubt that the Legislature has vested the particular power in the administrative body. In re Jamesburg High School Closing, 83 N.J. 540, 549 (1980); Hills Development v. Bernards, supra, 229 N.J. Super. at 341.[1] Third, the rule must be adopted as required by law. See N.J.S.A. 52:14B-4 (Administrative Procedure Act); 10:4-6 et seq. (Open Public Meetings Act).
There is a "strong" presumption, however, that a regulation is not arbitrary, and that it is legal and valid. Cooper River Convalescent Center v. Dougherty, 133 N.J. Super. 226, 232 (App.Div. 1975). There is a further presumption that the regulation falls within the agency's specifically granted powers. In re New Jersey Bd. of Public Utilities, 200 N.J. Super. 544, 557 (App.Div. 1985). It is the plaintiff's burden to overcome these presumptions. Furthermore, this court must defer to a choice of procedures by an administrative agency to implement legislative policy "so long as the selection is responsive to the purpose and function of the agency." Radiological Soc. of New Jersey v. New Jersey Dept. of Health, 208 N.J. Super. 548, 560 (App.Div. 1986), certif. den. 104 N.J. 444 (1986). With these principles in mind, we will examine the disputed sections.

I
N.J.A.C. 5:92-6.1 states that a municipality's present and future fair share of such housing will be determined "after crediting, on a one to one basis, [only] those housing units *10 created or rehabilitated after April 1, 1980." N.J.A.C. 5:92-6.1(a). Both Bernards and Cherry Hill contend that section 6.1 of the COAH rules violates the express provision in the Fair Housing Act that the agency give each municipality a "credit[] on a one to one basis [for] each current unit of low and moderate income housing...." N.J.S.A. 52:27D-307(c)(1). The restriction to pre-April 1, 1980 units thus appears ultra vires on its face; but we must look beyond the language to the purpose of both the statute and regulation.
COAH claims that if units existing prior to April 1, 1980 are included in those for which credit is given, then those living units would be "double counted." COAH explains that by its method of determining the present need for low and moderate income housing, "present" need was determined by the figures in the 1980 census. If a low or moderate income family lived in a standard, conforming, housing unit at the time of the census, the family was not included in the "need" figures, nor was the pre-1980 housing unit counted as a resource to satisfy such a need. As those homes have already been counted by giving credit against the total number of low and moderate income families in the community, COAH argues, to count them again will falsely double their number.
The municipalities assert that the Legislature determined that it was important to "maximize the number of low and moderate income units" in New Jersey, and that a "timely achievement of an appropriate fair share of the regional need for law and moderate income housing" was desired. N.J.S.A. 52:27D-302f. Although the Legislature left to COAH the job of "[a]dopt[ing] criteria and guidelines" for determining a municipality's present and future fair share of the housing need, it gave COAH a specific direction concerning how such a determination must be made. N.J.S.A. 52:27D-307c. According to the Legislature, a municipal fair share "shall be determined after crediting on a one-to-one basis each current unit of low and moderate income housing of adequate standard...." N.J.S.A. 52:27D-307c(1) (emphasis added).
*11 The municipalities reason that if at a time subsequent to 1980 the pre-1980 home becomes vacant through the relocation of the family who formerly resided in it, the unit is as available to satisfy the housing need of a current low or moderate income resident as any unit constructed or rehabilitated after the 1980 date. We are specifically asked to consider numerous units of senior citizen housing which become available after the death or relocation of the residents. We are further told that if we do not consider these units as available to satisfy the fair share of such communities, then the newly constructed housing would absorb the share determined by COAH, and the vacancies in the older housing would absorb low and moderate income families from other communities in excess of any indigenous and regional needs assessed by COAH. If such were the fact, the regulations would indeed violate the evident plan of the Legislature.
But the municipalities' model does not comport with reality. The COAH standard focused on the 1980 census and determined from 1980 forward how many low and moderate income families not then living in standard units required housing at that time in each of the communities in each region. It is true that the pre-1980 units would at some point become vacant through a variety of factors: death of the tenant, the ability of the tenant to afford more expensive housing, relocation of the tenant out of the municipality or region, or any other factor resulting in a vacancy. But since the situation is not static, competing factors remain in the housing market. For every dwelling vacated by death, another is filled by a newly formed family unit when a person, couple or family of low or moderate income first sets up housekeeping. For every unit vacated by a family moving from the municipality, another may move into the community. For every family whose affluence permits it to move to more expensive housing, another, because of reduced circumstances, will first fit the definition of low or moderate income and be seeking the vacated living unit. By excluding the pre-1980 units, COAH's model balanced these factors and *12 just dealt with families housed in substandard housing or no housing at all; COAH then projected the growth of these figures and the need to have each municipality absorb its fair share of the required new housing.
It is true that COAH did not follow the literal language of the statute. It could have determined the total number of existing low and moderate income families (not just those who had no housing or were housed in substandard units), and also the total number of existing conforming low and moderate income dwelling units. If all of the existing conforming units were then subtracted, as specifically stated in the statute, the resulting figures should be the same as those reached by COAH. The pre-1980 conforming unit would cancel out the pre-1980 families housed in them. We cannot say, therefore, that this regulation "alter[ed] the terms of a legislative enactment or frustrate[d] the policy embodied in the statute." N.J. Chamber of Commerce v. N.J. Elect. Law Enforc. Comm., 82 N.J. 57, 82 (1980).[2]

II
COAH not only restricts credits to those units built after April 1, 1980, it also requires that credits are only available if "a unit's occupancy is restricted to low or moderate income *13 households ..." unless it fits one of two exceptions not here applicable. N.J.A.C. 5:92-6.1(a) (emphasis supplied). The Fair Housing Act contains no language restricting its application to dwelling units legally limited to residents with low household incomes. Under the statute it is only the actual income of the occupants, not the legal restriction on the housing, that is crucial. The Act states specifically that "[m]unicipal fair share shall be determined after crediting ... each current unit of low and moderate income housing ... including any such housing constructed or acquired as part of a housing program specifically intended to provide housing for low and moderate income households." N.J.S.A. 52:27D-307c(1), (emphasis supplied). The very use of the word "including" indicates that the Legislature intended that a municipality's fair share be comprised of more than such legally or contractually limited housing.
Here COAH has overstepped its authority; it has created a provision that is both facially invalid and can be shown to create a vast practical difference if implemented. COAH has not merely established a model conforming to the broad dictates of the enabling legislation. If a well-maintained apartment house had been built in 1981 in an area of the community inhabited predominately by those of low and moderate income, and over the years the history of the occupancy showed that a given percentage of its units are actually occupied only by families satisfying this income requirement, COAH would nevertheless exclude these apartments from its calculations because the units were not "restricted to low or moderate income households." Theoretically, a municipality whose citizens were farsighted and civic-minded enough to see that conforming housing was voluntarily built to satisfy its entire present and future need for low and moderate income housing could be ordered by COAH to build double the number of units that its fair share would indicate, if the community did not place either ordinance or contract restrictions on the units. The half already built would be occupied by the number of families *14 required to satisfy the community's indigenous and regional obligation, and the other half either would remain unoccupied or would be occupied by families from adjoining communities which had failed to act with equal foresight.
We cannot imagine that the Legislature would have wished to penalize communities that had acted without compulsion or in which housing had been built unencumbered by contractual or legal restriction to low income families. Here the administrative regulation did alter the terms of the legislative enactment, and in this respect the section frustrates the "policy embodied in the statute," N.J. Chamber of Commerce v. N.J. Elect. Law Enforc. Comm., supra, 82 N.J. at 82. This provision therefore must be stricken from the rules. COAH may, however, otherwise insure that housing which qualifies for credits be more than temporarily available for low and moderate income families.

III
In N.J.A.C. 5:92-8.4(c), COAH states that it "require[s] a 20 percent maximum set-aside and a minimum gross density of six units per acre on vacant and developable sites." That minimum can be modified should certain factors arise (affecting appraised land values, improvement costs, site conditions, etc.). Bernards Township argues that requiring six units per acre is "arbitrary" and states that even COAH's Chairman recognized it as such. The Township also argues that any fixed number is arbitrary, capricious and unreasonable, and that no specific number of units per acre should be required.
Unlike the previous issue, this COAH regulation is not facially invalid. The Act does not specify how many homes should be built per acre, nor does it even state that COAH should establish a presumptive number of homes per acre. N.J.S.A. 52:27D-305. This six unit minimum, however, is the agency's interpretation of the legislative directive. It can only be overturned by us if it is found to be "[un]responsive to the purpose *15 and formation of the agency." Radiological Soc. of New Jersey, supra, 208 N.J. Super. at 560.
We find that the setting of a presumptive minimum density is not "unresponsive" to the purpose of COAH. While COAH is not specifically directed to establish guidelines for the density of housing, the Legislature made an explicit determination "to provide various alternatives to the use of the builder's remedy as a method of achieving fair share housing." N.J.S.A. 52:27D-303. See Holmdel Builders Ass'n. v. Tp. of Holmdel, 232 N.J. Super. 182, 199-200 (App.Div. 1989). This density criterion and guidelines are intended to achieve that end, and thus should be presumed valid unless Bernards can prove the regulation is arbitrary, capricious, unreasonable, irrational, or outside the legislative intent.[3]Bergen Pines v. N.J. Dept. of Human Services, supra, 96 N.J. at 477. Bernards has failed to meet this burden, and therefore this exercise of COAH's authority will be upheld.

IV
The entire subsection of 5:92-8 is titled "Municipal Adjustments," and its purpose is to provide "the criteria by which a municipal fair share may be adjusted." N.J.A.C. 5:92-8.1. Rules 5:92-8.5(f) and -8.6(h) are identical with the sole exception that the latter adds the word "affordable" where designated by parenthesis:
Where a municipality has designated sites for low and moderate income housing that lack adequate infrastructure and where the New Jersey Department of Environmental Protection or its designated agent approves a proposal to provide (affordable) infrastructure to a site other than those designated for the development of low and moderate income housing in the housing element, the municipality shall amend its housing element and fair share housing ordinance to permit development of such site for low and moderate income housing. The *16 amended housing element and fair share housing ordinance shall be submitted to the Council within 90 days of the site's approval by the New Jersey Department of Environmental Protection or its agent.
Bernards Tp. argues that the provisions in subsections 8.5(f) and 8.6(h) have "created an instant builder's remedy" because they allow "a non-designated owner" to "propose a plan to the DEP to provide infrastructure on its own site." If the DEP approves the plan it would "effectively mandate a change in the municipality's zoning...." Bernards argues that the power to zone is legislative, and although it may be delegated to municipalities, it may not be subdelegated to the DEP.
COAH correctly notes that the rules do not delegate any zoning power to the DEP. Instead, they are designed as "recognition of the role DEP plays in granting approvals for public facilities and infrastructure.... DEP simply performs its normal statutory function of evaluating the application from an engineering standpoint. The zoning power remains entirely with the municipality." COAH cites several comments made by its attorney during the hearings prior to the adoption of the rules to reinforce this philosophy:
[I]t is absolutely no question that the language... does not permit the DEP to re-zone anything.... It has nothing to do with DEP zoning. They merely look at the application from an engineering standpoint to approve this.
At oral argument before us, counsel for Bernards Township stated that with this explanation, there was no longer any real dispute concerning these sections. We therefore consider the application to set them aside withdrawn, based upon COAH's explanation; we hold that if the regulations are interpreted consistent with this explanation, they are valid.

V
N.J.A.C. 5:92-5.3, "Distribution of Need," states that such distribution "shall be accomplished through ... economic and land use factors...." Four factors are reviewed to distribute the housing region's need: growth area, covered employment, aggregate per capita income, and covered employment *17 change. (N.J.A.C. 5:92-5.3a.). Cherry Hill objects to the use of the factor of aggregate per capita income, stating that using any income factor is arbitrary, unreasonable and capricious. It argues that the use of income as a factor hinges on an erroneous premise by COAH's consultant "that municipalities have the power to pass a `special assessment' to fund the cost of low and moderate income housing." Cherry Hill urges that there is no such power to enact such an assessment, and, furthermore, there is no "rational nexus between" income of a municipality and its ability to support Mt. Laurel housing.
COAH explains that income is a necessary factor, as "[a] municipality with a higher aggregate per capita income would be better able to support an increase in taxes which may be necessary to support ... schools or police." It also states that "[t]he use of income data in the distribution of the fair share need is not a novel concept" and relies on precedent which favors an agency's interpretation of its legislative directives. IFA Ins. Co. v. New Jersey Dept. of Ins., 195 N.J. Super. 200, 208 (App.Div. 1984), certif. den. 99 N.J. 218 (1984). We agree that because income has been used as a factor in making similar determinations, and because using such a factor is not outside the scope of COAH's powers and does further its purpose, COAH's use of income in allocating the burden of Mt. Laurel housing is not arbitrary, capricious, unreasonable or irrational, and should be upheld.
Judge Serpentelli addressed precisely this question in AMG Realty Co. v. Warren Tp., 207 N.J. Super. 388, 434-436 (Law Div. 1984). He stated that including a municipality's income as a factor in determining its need for low and moderate housing "seeks to equitably distribute" the "substantial financial burdens" that Mt. Laurel obligations may impose on a community. Id. at 435. It encourages a town to plan "for all income levels" and rewards those towns that have "prior inclusionary construction." Ibid. While Judge Serpentelli acknowledged doubts "whether further experience will demonstrate that this factor will accomplish its objectives," he added that "those *18 concerns are overridden by the importance of having an economic indicator which mirrors fiscal capacity, prior exclusion, and most importantly, past inclusion." Ibid. He added that "[e]ventually, the planners and statisticians may develop data which will verify whether there is a connection between median income [the particular type of income factor in question in AMG Realty] and these objectives." Id. at 435-436. COAH enacted this rule two years after Judge Serpentelli's opinion, thus indicating a belief that there is a rational connection between an income factor and the objectives of including income as a factor.
Cherry Hill claims that imposing additional low and moderate income housing on a community with higher income, where the community in turn can only pay the additional costs by imposing higher real estate taxes, places an unfair burden upon the existing poorer families residing in that community. If income is not a factor, then the poorer families of the entire region would bear the same share of increased costs of the new housing. If income is a factor, in a poorer community both the less fortunate and wealthier taxpayers would receive a windfall; in the wealthier community both the more affluent taxpayers and poorer taxpayers are forced to bear a disproportionate share of the region's expenses. Although not couched in the terms of a constitutional equal protection argument, Cherry Hill's argument boils down to a claim that increased taxes will be imposed, not based upon each taxpayers' income, but upon the taxpayer's owning property in a wealthier community. Cherry Hill correctly reasons that this is not the imposition of a burden based upon wealth, since the municipality (the "wealthy" entity) bears none of the expense; it passes the expenses through to its taxpayers.
In the abstract, this argument might have merit. However, viewing the realities of municipal development in New Jersey, it is apparent that the poorer communities already suffer from the highest tax rates in the State, resulting from the need for increased police protection, fire protection, health services and *19 the like. Even though there are poor families in wealthy communities, they already benefit from lower municipal expenses. The inclusion of municipal income as one of four factors is not so inherently arbitrary, capricious or unreasonable as to overcome the presumption of validity accorded an agency's rules. The fact that Cherry Hill disagrees with the inclusion of this factor is insufficient to upset the regulation. Worthington v. Fauver, 88 N.J. 183, 204-205 (1982). "So long as the selection is responsive to the purpose and function of the agency," we should give deference to the agency choice. Radiological Soc. v. New Jersey State Dept. of Health, supra, 208 N.J. Super. at 560. We therefore will uphold the use of the income factor in determining a municipality's fair share.

VI
Cherry Hill next argues that N.J.A.C. 5:92-8.3 does not provide for adequate recreation space and therefore is arbitrary, capricious and unreasonable. The section is entitled "Adequate recreation, conservation and open space." Subsection (a) states, in pertinent part, that
[m]unicipalities may reserve three percent of their total developed and developable acreage for active municipal recreation and exclude this acreage from consideration as potential sites for low and moderate income housing.
Subsection (b) allows for additional recreation areas to be excluded. These provisions are pertinent to the adjustment of a municipality's fair housing burdens as initially computed by COAH. Specifically excluded is that land which has been designated for recreation, conservation and open space areas in an adopted county master plan, or is specifically mentioned in ordinances or capital improvement programs, or is part of an application by the county to set aside the land permanently for Green Acres or other appropriate programs.
Cherry Hill claims that the three percent figure in subsection (a) was intended by the Department of Environmental Protection in its New Jersey 1984 Outdoor Recreation Plan to be a minimum, not a maximum of set-aside land, and that subsection *20 (b) "grants municipalities and their residents nothing since it conflicts with existing law and other regulations." COAH disagrees, and by reference to both the regulation and practice, clearly shows that the three percent figure is neither written as nor intended to be a maximum. In fact, subsection (b) allows municipalities to reserve specific vacant sites for recreation and conservation above the three percent permitted by subsection (a). By a post-argument submission to us, COAH reiterated its position expressed at oral argument. We fully subscribe to that analysis, and quote a portion here:

N.J.A.C. 5:92-8.3(a) sets forth the formula for calculating how much land a municipality may claim for open space purposes, thereby exempting it [the land] from consideration for development with low and moderate income housing. The municipality first adds together all developed and developable land. Developable lands as set forth in the regulation are all vacant land and undeveloped land less historically and architecturally important lands, agricultural lands and environmentally sensitive lands. Additionally, the municipality also deducts those lands owned by nonprofit organizations, counties, and the state or federal government which are precluded from development. The municipality then may reserve three percent (3%) of that total for open space. If a municipality has dedicated land for recreational purpose or open space, that land is considered part of the three percent that the municipality may reserve.
The confusion seemed to arise from the last line of N.J.A.C. 5:92-8.3(a) which states
`existing active municipal recreation areas shall be subtracted from the three percent calculation of total developed and developable acreage to determine additional land that may be reserved for active municipal recreation.'
This sentence simply means that municipally-owned recreation land is not excluded from the three percent calculation as is state, federal or nonprofit-owned land but rather is considered part of the three percent. This is to prevent the possibility of abuse ... namely, the possibility of a municipality ... claiming that its vacant land is all open space thereby precluding development of low and moderate income housing.
Of course, ... if after performing the above calculations a municipality has in excess of three percent, the Council's regulation does not require the municipality to consider that land over and above the three percent for affordable housing. The municipality may keep all land as open space which has been dedicated as such. It merely says that the municipality may not claim more land to be exempt, thereby potentially frustrating satisfaction of the constitutional obligation.
Cherry Hill has not overcome the presumption of validity inherent in N.J.A.C. 5:92-8.1(a) and (b), and the regulations will be upheld.

*21 VII
Cherry Hill next attacks COAH's failure to use "vacant land" as one of the principal criteria for the distribution of the region's housing needs. The Fair Housing Act provides no specific factors by which COAH is to determine the present and prospective fair share need of a given region. It states only that such factors are to be decided upon by COAH, after a one-to-one crediting of current housing, as discussed earlier. N.J.S.A. 52:27D-307c(1). The Act does provide, however, factors which COAH is to use in adjusting a municipality's fair share. Those factors include infrastructure considerations, environmental or historic preservation factors, and "available vacant and developable land." N.J.S.A. 52:27D-307c(2). Vacant land itself is an inappropriate factor to use in determining a municipality's presumptive share. If a community has exhausted vacant land by construction of non-inclusionary housing and commercial or industrial uses to the exclusion of affordable housing for the poor, it should not be rewarded. The Supreme Court has stated that a community should not be able to build factories without recognizing the need for housing for those who work in them. Mt. Laurel (I), 67 N.J. at 172-173.[4]
In response to the statute's mandate, COAH first promulgated N.J.A.C. 5:92-5.3, entitled "Distribution of need," which lists the four factors used to determine the distribution of the region's needed housing among the subject municipalities: growth area, covered employment, aggregate per capita income and covered employment change. Then under the heading of "Municipal Adjustments," N.J.A.C. 5:92-8 et seq. establishes the rules to carry out the legislative intent in adjusting each municipality's fair share as initially determined by an *22 application of the four factors. N.J.A.C. 5:92-8.2, entitled the "Adjustment process," states:
The Council shall determine the amount and location of vacant and undeveloped land within a municipality. Specific parcels of vacant and developable lands shall be excluded as potential sites for low and moderate income housing based on the following criteria.
The section then lists such criteria as historic and architecturally important sites, and agricultural and environmentally sensitive lands, conforming to the mandate of the Act. N.J.A.C. 5:92-8.2(b).
Specifically, Cherry Hill contends that "actual vacant land is not a factor" in the computation of a municipality's fair share, and that "[n]ot using actual vacant land in the computation of a municipality's fair share is arbitrary, unreasonable and capricious." The Legislature did not dictate that vacant land be used as a factor in determining need, but only in determining adjustments to that need. Therefore, COAH's omission of vacant land as a factor in N.J.A.C. 5:92-5.3 was neither ultra vires nor in violation of the legislative intent, as the Legislature, aware of such a factor, included it in one set of criteria (adjustments) but omitted it from another (need). N.J.S.A. 52:27D-307c(1) and (2).
COAH's rules carry out the legislative objective, and they are additionally benefited by the presumption of validity, Bergen Pines Hosp. v. Dept. of Human Serv., supra, 96 N.J. at 477. Cherry Hill has not overcome this presumption, and we therefore uphold COAH's rules that include vacant land as a factor only in adjusting a community's needs for low and moderate income housing, but not in determining those needs.

VIII
Cherry Hill argues that the rules promulgated by COAH were adopted in violation of the Open Public Meetings Act, N.J.S.A. 10:4-6 et seq., and that therefore the rules it challenges (N.J.A.C. 5:92-5.3; 5:92-8.3(a) and (b); 5:92-6.1 and 5:92-8.1) should be set aside. Cherry Hill states that there are *23 no minutes for "at least two meetings" and that the "record is replete with numerous executive sessions" for which there are also no minutes. Cherry Hill then lists pages of minutes of other meetings which allegedly violate the Act's requirement that minutes be "reasonably comprehensible."
COAH argues three points in rebuttal: first, it is the Administrative Procedure Act which governs its adoption of rules, not the Open Public Meetings Act; second, Cherry Hill did not raise this argument in a timely manner; and third, contrary to all Cherry Hill's contentions, the adoption of the COAH rules fully complied with the provisions of the Open Public Meetings Act.
In the introduction to its brief, COAH states that appellant's argument "confuses the procedures for adopting regulations with those for conducting public meetings." While COAH is correct that the Administrative Procedures Act governs its adoption of rules, COAH is wrong when it implies that because the Administrative Procedure Act governs the method by which it adopted the rules, the Open Public Meetings Act does not apply to the meetings at which COAH adopted them. COAH was required to follow the mandates of both the Open Public Meetings Act and the Administrative Procedure Act. Furthermore, it is apparent from the "Legislative findings and declaration" in N.J.S.A. 10:4-7 that all of COAH's meetings, whether or not they were for the adoption of rules, were required to be open:
The Legislature ... hereby declares it to be the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way....
The Act goes on to describe agencies falling within the ambit of the Act in its definition of "Public body":
a ... council ... organized under the laws of this State, and collectively empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, ... or other legal relations of any person.... [N.J.S.A. 10:4-8].
*24 This definition describes COAH.[5] COAH therefore must operate under the auspices of the Open Public Meetings Act. In fact its own minutes of November 18, 1985 show that the Act was explained to its members by its counsel. In order to determine whether COAH violated the Open Public Meetings Act's procedure for meetings, we must review each of Cherry Hill's claims.

A.
Cherry Hill first asserts that there were "at least" two meetings for which there "apparently" are no minutes. It is incorrect. The minutes of one "missing" meeting are in their proper place, and the other "meeting" is but a mistaken date reference in the minutes of another meeting.[6]

*25 B.

Cherry Hill next contends that COAH held a meeting and executive session on December 9, 1985 without giving proper notice to the public. COAH argues that "Cherry Hill has not brought the proper action within the requisite time period."
According to the Open Public Meetings Act, Cherry Hill had only 45 days "after the action sought to be voided has been made public" in which to institute a proceeding against the December 9 meeting. N.J.S.A. 10:4-15a. The minutes were prepared on the date of the meeting, and the meeting was formally made public, at the latest, on December 16, 1985, the date its minutes were adopted. Cherry Hill's petition to void any action taken at the meeting was filed September 1986, well after the 45-day limit; COAH is therefore correct that the petition is out of time.
COAH claims additional protection by the public notice it gave of its meetings. N.J.S.A. 10:4-15a provides that "any action for which advance published notice of at least 48 hours is provided as required by law shall not be voidable solely for failure to conform with any notice required in this act." (emphasis added). This language has been interpreted to "bespeak a legislative intention to provide `maximum flexibility in rectifying governmental action which falls short of the standards of openness prescribed for the conduct of official business.'" Precision Indus. Design Co., Inc. v. Beckwith, 185 N.J. Super. 9, 15 (App.Div. 1982) certif. den. 91 N.J. 545 (1982), quoting Polillo v. Deane, 74 N.J. 562, 579 (1977). Therefore we further have the discretion to allow COAH to disregard this possible "fall[ing] short of the standards of openness," if the 48-hour notice can be substantiated.
According to Cherry Hill, COAH held the December 9 meeting after giving notice of it on December 11th (two days after it was held). A study of the record confirms that this appears in *26 the minutes as the date of notice. But there seems to be little evidence that this was anything but a typographical error, and COAH in its brief predictably so alleges. COAH did not publish the notice of its meetings in the sense of placing an "official notice" advertisement in the newspaper. By post-argument submission COAH provided us with a copy of its letter to various newspapers giving notice of its December 9, 1988 meeting. COAH's letter to the newspapers was dated November 20, 1985, and therefore ostensibly complied with N.J.S.A. 10:4-9a and 10:4-10. The statute only requires "adequate notice" to the public of a meeting; and N.J.S.A. 10:4-8d defines the term "adequate notice" as giving written notice to newspapers at least 48 hours before the meeting. Unlike N.J.S.A. 40:55D-12a (required publication under the Municipal Land Use Law), and N.J.S.A. 40:53-2 (publication generally of public notice by municipalities), N.J.S.A. 10:4-9 and 10:4-8 do not require that notice be published by the newspapers, only that it be sent to the newspapers 48 hours before the meeting. See also Worts v. Upper Tp., 176 N.J. Super. 78, 81 (Ch.Div. 1980).
This "adequate notice" standard of N.J.S.A. 10:4-9a, which limits the matters that may lawfully be considered, is not the same as the "advanced published notice" which may be required by law for specific governmental actions in N.J.S.A. 10:4-15a. COAH, however, cannot claim the protection of N.J.S.A. 10:4-15a, since it gave no "published notice," but only "adequate notice" of the meeting, and such publication was not "required by law."

C.
Cherry Hill next argues that COAH violated the Act by holding "executive sessions" or closed meetings. See N.J.S.A. 10:4-12. COAH again urges that this complaint is barred for untimeliness. COAH further claims that "either no executive session[s] [were] held, or a resolution was adopted by the *27 Council [pursuant to N.J.S.A. 10:4-13] to adjourn to executive session."
N.J.S.A. 10:4-13 states:
No public body shall exclude the public from any meeting to discuss any matter ... until the public body shall first adopt a resolution, at a meeting to which the public shall be admitted:
a. Stating the general nature of the subject to be discussed; and
b. Stating as precisely as possible, the time when and the circumstances under which the discussion conducted in closed session of the public body can be disclosed to the public.
In response to the Open Public Meetings Act, COAH did indeed adopt these resolutions, although their substance is not set forth in the minutes.
Cherry Hill cites nine references to such sessions, all of which took place between March 17, 1986 and August 4, 1986. Three of these notations, in the minutes for March 17, 1986, April 7, 1986 and April 14, 1986, state only that such sessions were called. A fourth, for August 4, 1986, adds only that "and the Resolution was read." The April 11, 1986 minutes additionally state merely that "the Chairman read the Resolution for Executive Session." Two more, April 21, 1986 and June 9, 1986, were variations of the April 11, 1986 language. The minutes of April 21, 1986 and April 28, 1986 were similar, but somewhat more explicit: "An executive session was called by [the Chairman].... The resolution authorizing [COAH] to conduct an executive session was read by [the Chairman]."
If one looks solely at the cursory treatment accorded the announcement of such executive sessions in the minutes of the meetings, it might appear that COAH failed to heed N.J.S.A. 10:4-13a and b. But the minutes are not the resolutions themselves. Cherry Hill has failed either to provide us with any of the resolutions or otherwise to demonstrate that the resolutions read at the meetings were not drawn and adopted in full compliance with the Act. Given the presumption of regularity of governmental actions, we will not assume irregularity based upon a completely unsupported allegation.

*28 D.

Cherry Hill's next contention is that COAH did not keep "reasonably comprehensible" minutes, required by N.J.S.A. 10:4-14.
N.J.S.A. 10:4-14 states that
[e]ach public body shall keep reasonably comprehensible minutes of all its meetings showing the time and place, the members present, the subjects considered, the actions taken, the vote of each member and any other information required to be shown in the minutes by law....
The elements required to make the minutes "reasonably comprehensible" are listed in the section. Although Cherry Hill claims that much more is needed, specifically, the reasons why the members voted as they did, we disagree. COAH has done all that the statute required it to do in recording its minutes.
We find there is no merit to Cherry Hill's contentions concerning missing minutes, late notice, noncompliance of the resolutions providing for the executive sessions, or insufficiency of COAH's minutes.

IX
Bernards Township argues that any objectionable administrative rule may be deleted without affecting the validity of the remaining rules. COAH does not dispute this statement, and its rules do, in fact, provide such a severability clause. N.J.A.C. 5:92-1.2.
The only rule raised by either Bernards Tp. or Cherry Hill that should be stricken under this provision is the portion of 5:92-6.1 which forbids credit for homes that were constructed without a contractual or legal restriction on income. That provision, as noted earlier, is beyond the scope of COAH's authority. It well can be severed without impairing the balance of the regulation.
With the exception of the single stricken provision, we determine that the challenged COAH regulations are valid and enforceable.
NOTES
[1] The apparent inconsistency of those two rules requires an analysis of the purpose of the statute. Remedied legislation, such as the statute and regulations here under review are to be broadly construed. See Sutherland Stat. Const. § 65.02, 65.03 (4th Ed. 1986); Lower Main v. N.J. Housing & Mortg., 114 N.J. 226, 235-236 (1989).
[2] We acknowledge that there is some slight difference between the legislative mandate requiring the use of "current" data and the methodology chosen by COAH. By focusing on the 1980 census, COAH has failed to give effect to unequal forces which may dictate the migration of families in or out of specific municipalities. A municipality with extensive emigration will leave a vacuum in its pre-1980 housing, and thus will absorb additional low and moderate income families from adjoining municipalities. The same would be true in a municipality with a substantially older population, where the death rate would exceed the rate of creation of new families. The opposite effect would be noticed in a municipality with net immigration or a younger population. But these differences over the short term between the periodic revisions of data after each census are potentially subject to adjustments by COAH in determining the fair share that each municipality will absorb. The present regulations are not frozen; experience may dictate reasonable modifications.
[3] We have noted the use of only a presumptive figure, which the regulation clearly states can be increased or decreased as the site and circumstances may dictate. We also find that the so-called recognition of the arbitrariness of the six unit per acre figure by the COAH chairman was quoted out of context.
[4] The regulations also provide for credits that such a municipality may purchase if construction is inappropriate. N.J.A.C. 5:92-11.1 et seq.
[5] COAH also must conform to the Administrative Procedure Act, which directs how a State agency must adopt its rules. N.J.S.A. 52:14B-1 et seq. According to the definition section, N.J.S.A. 52:14B-2, COAH is an "agency" because it is "authorized by statute to make, adopt or promulgate rules or adjudicate contested cases."
[6] The first of alleged "missing" minutes relates to a meeting held between October 15, 1985 and November 25, 1985. Not only was there a meeting, but the minutes of that meeting were located in an obvious place: between the citations for the minutes of the October 15th and November 25th meetings. Cherry Hill notes the citations for the minutes of October 15th and November 25th in its brief, yet does not question why there is a space of seven pages between citations. (Furthermore, Cherry Hill mistakenly notes the date of this meeting as November 12 instead of November 18).

Cherry Hill's declaration that there was a second meeting for which there are no minutes is similarly unfounded. Cherry Hill notes that in the minutes of the March 3, 1986 meeting there is a reference to a "3/13" meeting. The next meeting for which there are minutes in the record, however, is March 17. Furthermore, as Cherry Hill's brief recognizes, the meeting of March 3 is labeled "Meeting VIIII [sic]... while the 3/17/86 meeting is denominated Meeting X ... which would seem to indicate that no minutes in fact exist [for the March 13, meeting]." This is hardly proof that a secret meeting was held between March 3 and 17.
Therefore Cherry Hill's claim that "there were at least two meetings for which apparently there are no minutes" is unwarranted.