6 A.3d 445

IN THE MATTER OF THE ADOPTION OF N.J.A.C. 5:96
AND 5:97 BY THE NEW JERSEY COUNCIL ON
AFFORDABLE HOUSING.

Superior Court of New Jersey
Appellate Division

Argued December 1, 2009—Decided October 8, 2010.

464

466

Before Judges SKILLMAN, FUENTES and SIMONELLI.

*Edward J. Buzak* argued the cause for appellant New Jersey State League of Municipalities (*The Buzak Law Group,* attorneys; *Mr. Buzak* and *Susan L. Crawford,* on the brief).

*Stuart R. Koenig* argued the cause for appellants in A–5404–07: Marvin J. Joss; the Townships of Clinton, Bethlehem, Readington, Union, Bedminster, Bernards, Bridgewater, Montgomery, Warren, Hanover, Roxbury, Greenwich and Millstone; the Town of Clinton; and the Boroughs of Bernardsville, Peapack–Gladstone, Watchung, Florham Park, Wharton, and Roseland (*Stickel, Koenig & Sullivan,* attorneys; *Mr. Koenig,* on the brief).

*Ronald C. Morgan* argued the cause for appellants Township of Medford in A–5423–07 and Township of Cinnaminson in A–5460–07 (*Parker McCay,* attorneys; *Douglas E. McCollister,* on the brief).

*Stephen Eisdorfer* argued the cause for appellant New Jersey Builders Association in A–5424–07 (*Hill Wallack,* attorneys; *Mr. Eisdorfer, Thomas F. Carroll, III,* and *Henry T. Chou,* on the brief).

*Christopher J. Norman* argued the cause for appellant Township of Mount Laurel in A–5429–07 (*Norman, Kingsbury & Norman,* attorneys; *Mr. Norman,* on the brief).

*Kevin D. Walsh* and *Adam M. Gordon* argued the cause for appellant in A–5451–07 and intervenor in A–5761–07 (*Fair Share Housing Center,* attorneys; *Mr. Walsh, Mr. Gordon,* and *Peter J. O'Connor,* on the brief).

*Jeffrey Kantowitz* argued the cause for appellants Kings Row Homes, LLC, MTAE, Inc., & Kenneth and Alice Martin in A–

5455–07 (*Day Pitney LLP*, attorneys; *Mr. Kantowitz*, of counsel and on the brief).

*John F. Russo, Jr.*, argued the cause for appellants Townships of Toms River, Jackson & Brick in A–5458–07 (*Russo & Cassidy*, attorneys; *Mr. Russo*, on the brief).

*Jeffrey R. Surenian* argued the cause for appellants Township of Wall in A–5752–07; City of Summit in A–5756–07; Township of Oldmans in A–5757–07; Township of Mantua in A–5758–07; Township of Freehold in A–5760–07; Township of Egg Harbor in A–5761–07; Borough of Eatontown in A–5763–07; Borough of Atlantic Highlands in A–5767–07; and Township of Middletown in A–5871–07 (*Jeffrey R. Surenian and Associates*, attorneys; *Mr. Surenian*, of counsel and on the briefs; *Michael A. Jedziniak, Nancy L. Holm*, and *Donna A. McBarron*, on the briefs).

*Kevin J. Moore* argued the cause for appellant New Jersey Chapter of the National Association of Industrial and Office Properties in A–5920–07 (*Sills Cummis & Gross*, attorneys; *Mr. Moore*, of counsel; *Robert A. Kasuba*, on the brief).

*Buchanan Ingersoll & Rooney*, attorneys for appellant SJM Communities, Inc., in A–5461–07 (*Henry L. Kent–Smith*, of counsel and on the brief).

*Flaster/Greenberg*, attorneys for appellant ISP Management Co., Inc., in A–5590–07 (*Carl S. Bisgaier* and *David R. Oberlander*, on the brief).

*Marrazzo & Platt*, attorneys for appellant Borough of Berlin in A–5765–07 (*Stuart A. Platt*, of counsel; *Mr. Platt, Jeffrey R. Surenian* and *Donna A. McBarron*, on the briefs).

*Nancy Kaplen*, Assistant Attorney General, argued the cause for respondent Council on Affordable Housing (*Anne Milgram*, Attorney General, attorney; *Ms. Kaplen*, of counsel; *Geraldine Callahan, George N. Cohen*, and *Donald M. Palombi*, Deputy Attorneys General, on the brief).

*Outline of Opinion*

|  |  | Page |
|---|---|---|
| 1. | Introduction | 470 |
| 2. | Background: Partial Invalidation by Appellate Division of Original Third Round Rules and Adoption by COAH of Revised Third Round Rules | 471 |
| 3. | Pending Legislation that Would Abolish COAH | 477 |
| 4. | Invalidating "Growth Share" Methodology for Allocating Prospective Need for Affordable Housing | 478 |
| 5. | Remedy for Declaration of Invalidity of "Growth Share" Methodology: Order Requiring COAH to Use Methodology Similar to Those Used to Determine Prospective Need in Prior Rounds | 483 |
| 6. | Inappropriateness of Requiring COAH to Continue Use of Projected Statewide and Regional Prospective Need Determined Under Invalid Revised Third Round Rules | 485 |
| 7. | Invalidating *N.J.A.C.* 5:97–3.2(a)(4)(iv), Which Authorizes Substantive Certification of Compliance Plans that Rely Upon Municipality–Sponsored Affordable Housing Projects Without Specifying Location of Sites or Source of Funding | 487 |
| 8. | Invalidating Parts of Revised Third Round Rules that Do Not Provide Sufficient Incentives for Developers to Construct Inclusionary Developments | 488 |
| 9. | Invalidating *N.J.A.C.* 5:97–3.5, Which Authorizes Rental Bonus Credits for Prior Round Obligations | 493 |
| 10. | Upholding *N.J.A.C.* 5:97–3.18 and –3.19, Which Authorize "Smart Growth" and "Redevelopment" Bonuses | 495 |
| 11. | Invalidating *N.J.A.C.* 5:97–3.17, Which Authorizes "Compliance" Bonuses | 497 |
| 12. | Upholding COAH's Determination of Prior Round Affordable Housing Obligations | 498 |

13. Upholding COAH's Determination Not to Reallocate
Present Need for Affordable Housing in Urban Munici-
palities to Other Municipalities in the Region .......... 500

14. Rejecting Argument that Third Round Rules Improperly
Require Expenditure of Municipal Revenues to Satisfy
Affordable Housing Obligations ...................... 502

15. Rejecting Arguments that Third Round Rules were not
Adopted in Conformity with Administrative Procedure
Act............................................. 505

16. Rejecting Twenty Municipalities' Argument Regarding
Definition of "Prior Round Obligations" ............... 508

17. Egg Harbor's Challenge to Validity of *N.J.A.C.* 5:97–
5.8(a), Which Interprets 1000–Unit Cap Upon Affordable
Housing Obligations ............................... 508

18. Credits for Publicly–Financed Affordable Housing
Units ........................................... 509

19. Rejecting Requests for Relief in Pending Law Division
Actions ......................................... 510

20. Rejecting Requests to Divest COAH of Responsibility
for Adopting Third Round Rules and to Appoint a
Master ......................................... 510

21. Conclusion: COAH is Directed to Adopt New Third
Round Rules Within Five Months .................... 511

The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

1. *Introduction*

This opinion addresses twenty-two appeals challenging the va-
lidity of revised rules of the Council on Affordable Housing
(COAH), adopted under the Fair Housing Act (FHA), *N.J.S.A.*
52:27D–301 to –329.19, which establish the obligations of munici-
palities to provide affordable housing during the "third round"
period from 1999 to 2018 and provide mechanisms for municipali-

ties to achieve compliance with those obligations. In *In re Adoption of N.J.A.C. 5:94 and 5:95,* 390 *N.J.Super.* 1, 914 *A.*2d 348 (App.Div.2007) (*In re N.J.A.C. 5:94* ), we invalidated substantial portions of COAH's original third round rules and remanded to COAH for the adoption of revised rules in conformity with our opinion. We conclude that COAH's revised third round rules suffer from many of the same deficiencies as the original third round rules. Therefore, we once again invalidate substantial portions of those rules and remand to COAH.

2. *Background: Partial Invalidation by Appellate Division of Original Third Round Rules and Adoption by COAH of Revised Third Round Rules*

The articulation in *Southern Burlington County NAACP v. Township of Mount Laurel,* 67 *N.J.* 151, 336 *A.*2d 713, *appeal dism. and cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975) (*Mount Laurel I* ), of the *Mount Laurel* doctrine, under which developing municipalities were held to have an obligation to provide a realistic opportunity through their zoning for the construction of affordable housing for lower income households, and the evolution of that doctrine in *Southern Burlington County NAACP v. Township of Mount Laurel,* 92 *N.J.* 158, 456 *A.*2d 390 (1983) (*Mount Laurel II* ), were discussed at length in our prior opinion, 390 *N.J.Super.* at 15–21, 914 *A.*2d 348, and therefore do not need to be repeated here.[1]

The Legislature enacted the FHA in 1985 to confer responsibility upon an administrative agency for the administration and enforcement of the *Mount Laurel* doctrine. *See generally Hills Dev. Co. v. Twp. of Bernards,* 103 *N.J.* 1, 19–23, 31–40, 510 *A.*2d 621 (1986). To accomplish this objective, the Legislature assigned

---

[1] We only note that *Mount Laurel II* extended the obligation to provide a realistic opportunity for affordable housing for lower income households to all municipalities in the state rather than, as in *Mount Laurel I,* limiting that obligation to developing municipalities. *See* 92 *N.J.* at 214–15, 236–37, 243–44, 456 *A.*2d 390.

primary responsibility for the determination of municipal affordable housing obligations and the development of mechanisms for compliance with those obligations to COAH. *Id.* at 31–37, 510 *A.*2d 621. The FHA authorizes a municipality that has devised a plan for compliance with its affordable housing obligation to petition COAH for substantive certification of the plan. *N.J.S.A.* 52:27D–313. If COAH grants substantive certification, the municipality is insulated to a substantial extent from exclusionary zoning litigation for a period of what was previously six and is now ten years. *N.J.S.A.* 52:27D–313(a).[2] A municipality's participation in the administrative processes established by the FHA is purely voluntary; a municipality that chooses to litigate any exclusionary zoning actions in the courts, without petitioning COAH for substantive certification, may do so. *Hills, supra,* 103 *N.J.* at 35–36, 510 *A.*2d 621.

In *Hills,* the Supreme Court upheld the constitutionality of the FHA. The Court stated that "[a]t this point, the presumption of constitutionality must prevail. The judiciary must assume, if the assumption is at all reasonable, that the [FHA] will function well and fully satisfy the *Mount Laurel* obligation." 103 *N.J.* at 43, 510 *A.*2d 621. The Court cautioned, however, that "[i]f, ... as predicted by its opponents, the [FHA] ... achieves nothing but delay, the judiciary will be forced to resume its appropriate role." *Id.* at 23, 510 *A.*2d 621.

In accordance with the FHA's mandates that COAH "[d]etermine housing regions," *N.J.S.A.* 52:27D–307(a); "[e]stimate the present and prospective need for low and moderate income housing at the State and regional levels[,]" *N.J.S.A.* 52:27D–307(b);

---

[2] This insulation is not absolute. Substantive certification only creates a "presumption of validity" of a municipality's affordable housing plan. *N.J.S.A.* 52:27D–317(a). Furthermore, a municipality's zoning remains subject to challenge on grounds other than its satisfaction of the requirements of the *Mount Laurel* doctrine and the FHA. *See Sartoga v. Borough of W. Paterson,* 346 *N.J.Super.* 569, 577–78, 788 A.2d 841 (App.Div.), *certif. denied,* 172 *N.J.* 357, 798 A.2d 1270 (2002).

and "[a]dopt criteria and guidelines for [m]unicipal determination of its present and prospective fair share of the housing need in a given region," *N.J.S.A.* 52:27D–307(c)(1), COAH adopted "first round" and "second round" substantive rules prescribing municipalities' affordable housing obligations for the six-year periods running from 1987 to 1993 and 1993 to 1999 and the mechanisms for achieving compliance with those obligations. *N.J.A.C.* 5:92–1.1 to –18.20, and App. A to F; *N.J.A.C.* 5:93–1.1 to –15.1, and App. A to H. Those rules were described in detail in our prior opinion, *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 23–25, 914 *A.2d* 348, and there is no need to repeat those descriptions here. Suffice it to note that COAH's methodologies for determining municipal affordable housing obligations in the first and second round rules were quite similar to the methodologies that had been developed by trial courts before enactment of the FHA. *See id.* at 23–24, 914 *A.2d* 348.

In *Township of Bernards v. State, Department of Community Affairs,* 233 *N.J.Super.* 1, 12–22, 558 *A.2d* 1 (App.Div.), *certif. denied,* 118 *N.J.* 194, 570 *A.2d* 959 (1989), we rejected a series of challenges to parts of the COAH first round rules, except for one section dealing with the credits a municipality may claim in satisfying its affordable housing obligations. In *Calton Homes, Inc. v. Council on Affordable Housing,* 244 *N.J.Super.* 438, 446–53, 582 *A.2d* 1024 (App.Div.1990), *certif. denied,* 127 *N.J.* 326, 604 *A.2d* 601 (1991), we rejected challenges to other parts of the first round rules, except for a rule that established a 1,000–housing–unit cap on any municipality's affordable housing obligation. In *In re Township of Warren,* 247 *N.J.Super.* 146, 179–83, 588 *A.2d* 1227 (App.Div.1991), *rev'd in part on other grounds,* 132 *N.J.* 1, 622 *A.2d* 1257 (1993), we rejected a challenge to COAH's regulations, incorporated in the first and second round rules, which authorized municipalities to adopt affordable housing plans that failed to provide for housing units that are affordable to households earning less than 40% of the region's median income. Thus, with limited exceptions, the challenges to COAH's first and second round and other related rules were unsuccessful.

Although COAH should have adopted its third round rules by 1999, when the effective period of the second round rules expired, COAH did not adopt its original third round rules until 2004. As we have previously noted, this delay was "dramatic and inexplicable," and "[t]he public policies underlying the FHA and the *Mount Laurel* cases [were], quite obviously, . . . frustrated by inaction." *In re Six Month Extension of N.J.A.C. 5:91–1 et seq.*, 372 *N.J.Super.* 61, 95–96, 855 *A.*2d 582 (App.Div.2004), *certif. denied*, 182 *N.J.* 630 (2005).

The original third round rules were "designed to permit municipalities to meet a cumulative fair share beginning in 1987 and ending on January 1, 2014." *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 27, 914 *A.*2d 348. There were three major components of this cumulative fair share:

> (1) a municipality's "rehabilitation share" based on the condition of housing revealed in the data gathered for the 2000 Census, previously known as a municipality's indigenous need; (2) a municipality's unsatisfied prior round obligation (1987 through 1999), satisfaction of which will be governed by the second round rules; and (3) a municipality's "growth share" based on housing need generated by statewide job growth and residential growth from 1999 through 2014.
>
> [*Ibid.*]

COAH's original third round rules adopted a number of significant changes in the methodologies that had been used in the first and second round rules. The most significant of those changes was the adoption of a "growth share" approach for determining a municipality's fair share of the need for affordable housing generated by jobs and residential growth during the third round period from 1999 through 2014. Under such a methodology, a municipality is not required to provide a specific predetermined number of affordable housing units but only to provide additional affordable housing if job or residential growth actually occurs in the municipality. *See id.* at 29–30, 914 *A.*2d 348. Another highly significant change in the third round rules was the authorization for municipalities to require developers to construct affordable housing, without providing any compensating benefit, in particular, without granting the developer permission to construct housing at a higher

density than otherwise would apply under existing municipal zoning.

The Fair Share Housing Center (Fair Share) and the New Jersey Builders Association (Builders Association), both of which are also appellants in these appeals, together with two other parties, filed appeals challenging the validity of the original third round rules. Judge Cuff wrote a comprehensive opinion, which rejected some, but sustained other, of appellants' challenges to the original rules. *Id.* at 32–88, 914 *A.*2d 348.

Judge Cuff's opinion rejected appellants' arguments that the "rehabilitation share" of a municipality's affordable housing obligation, sometimes also referred to as present need, should include "cost burdened" low- and moderate-income households that reside in standard housing and households that lack permanent housing or live in overcrowded housing, *id.* at 33–38, 914 *A.*2d 348; that COAH's methodology for identifying substandard housing was "arbitrary and unreasonable," *id.* at 38–41, 914 *A.*2d 348; that the third round rules improperly eliminated the part of the first and second round methodologies that required reallocation of excess present need in poor urban municipalities to other municipalities in the region, *id.* at 56–60, 914 *A.*2d 348; that the use of regional contribution agreements to satisfy part of a municipality's affordable housing obligations violates the *Mount Laurel* doctrine and federal and state statutory provisions, *id.* at 80–81, 914 *A.*2d 348; that the allowance of bonus credits towards satisfaction of a municipality's affordable housing obligations unconstitutionally dilutes those obligations, *id.* at 81–84, 914 *A.*2d 348; and that the rule relating to vacant land adjustments violates the *Mount Laurel* doctrine and the FHA, *id.* at 84–86, 914 *A.*2d 348.

However, Judge Cuff's opinion invalidated the parts of the original third round rules that reduced statewide and regional affordable housing need based on "filtering," *id.* at 41–46, 914 *A.*2d 348; adopted a growth share approach for determining a municipality's fair share of prospective needs for affordable housing, *id.* at 49–56, 914 *A.*2d 348, and excluded job growth resulting from

rehabilitation and redevelopment in determining job growth, *id.* at 61–65, 914 *A.*2d 348; compelled developers to construct affordable housing without any compensating benefits, *id.* at 71–75, 914 *A.*2d 348; authorized a municipality to give a developer the option of payment of a fee in lieu of constructing affordable housing, but provided no standards for setting those fees, *id.* at 69–71, 914 *A.*2d 348; and authorized a municipality to restrict up to 50% of newly constructed affordable housing to households with residents aged fifty-five or over, *id.* at 75–80, 914 *A.*2d 348.[3] The court's rationales for the various rulings relevant to the issues presented in these appeals are discussed later in this opinion.

Based on our conclusion that the original third round rules were invalid in a number of significant respects, we remanded to COAH to adopt revised third round rules that conformed with the FHA and the requirements of the New Jersey Constitution as interpreted in the *Mount Laurel* decisions. *Id.* at 88, 914 *A.*2d 348. We directed that the revised rules be adopted within six months. *Ibid.*

COAH's process of reconsideration of the third round rules included retention of a number of experts, who produced lengthy and highly complex reports regarding the amount of vacant development land in the state, projections of jobs and residential growth through 2018, and methodologies for determining municipal affordable housing obligations.[4] This process resulted in a lengthy delay in COAH's adoption of the revised third round rules, and we twice granted COAH extensions of time for completing the remand.

---

[3] Our opinion held that "COAH would not violate the *Mount Laurel* doctrine if it continued to allow municipalities to age-restrict twenty-five percent of new development." *Id.* at 80, 914 *A.*2d 348. Consistent with this holding, COAH's revised third round rules only allow a municipality to age-restrict a maximum of twenty-five percent of the affordable units. *N.J.A.C.* 5:97–3.8 and –3.10 to –3.12. No party challenges the authorization for such an age-restriction.

[4] We note that COAH paid these consultants nearly $2 million.

COAH finally proposed the revised third round rules in January 2008. Although it received substantial public comments objecting to the proposed rules, on June 2, 2008, COAH adopted the rules without substantial change. *See* 40 *N.J.R.* 2690(a); 40 *N.J.R.* 3161(a). Twenty-four notices of appeal were filed challenging the validity of the revised rules. Two of those appeals were not pursued and have been dismissed.

Thereafter, COAH proposed, and on October 20, 2008, adopted, substantial amendments to the revised third round rules, which responded to some of the objections to the rules raised during the public comment period. 40 *N.J.R.* 5962(a); 40 *N.J.R.* 5965(a). The revised rules in their final form may be found at *N.J.A.C.* 5:96–1.1 to –20.4, and *N.J.A.C.* 5:97–1.1 to –10.5 and Appendices A through F.

Appellants filed amended notices of appeal challenging the revised third round rules as amended in October 2008. We now consolidate the appeals.

### 3. *Pending Legislation that Would Abolish COAH*

Before addressing appellants' numerous arguments regarding the validity of COAH's revised third round rules, we note that the Senate passed a bill on June 10, 2010, which would abolish COAH and transfer many of its responsibilities to the Department of Community Affairs. Office of Legislative Services, *New Jersey Legislative Digest,* 214th Leg., 1st Sess. (June 10, 2010), at 1, 2, and 7. The Assembly Housing and Local Government Committee held a hearing on the Senate bill on June 17, 2010. Office of Legislative Services, *New Jersey Legislative Calendar,* 214th Leg., 1st Sess. (June 15, 2010), at 1. However, the Committee has taken no action on the bill since then. *Bill Status Report on S–1,* http://www.njleg.state.nj.us/bills/BillView.asp (last visited Sept. 28, 2010). Therefore, it is difficult to predict whether this proposed legislation will be enacted.

Furthermore, even if the Assembly passed the Senate bill in its current form and the Governor signed it into law, these appeals

would not be mooted. Although the Senate bill as passed would abolish COAH, *Senate Comm. Substitute for S–1,* 214th Legis., § 2 (2010), the bill would preserve the effectiveness, at least on a temporary basis, of the rules and regulations adopted by COAH before its abolition, including the revised third round rules challenged in these appeals. Section 18(f) of the bill provides:

The [Department of Community Affairs] may apply the regulations of [COAH] in effect at the time a petition for substantive certification was filed, or may adopt new regulations, or revisions or amendments to existing regulations, concerning petitions for substantive certification.

Section 20(d) provides:

A municipality that received substantive certification under *N.J.A.C.* 5:96 and *N.J.A.C.* 5:97, [the revised third round rules challenged in these appeals] shall be considered an inclusionary municipality pursuant to this section until the end of its approved certification period; provided that the municipality continues to fully and faithfully implement the provisions of its fair-share plan.

Section 21(c) provides:

A municipality, in evaluating the economic viability of an application for an inclusionary development, may be guided by the applicable provisions of *N.J.A.C.* 5:96 and *N.J.A.C.* 5:97, . . .

Therefore, there is no reason to delay issuance of this opinion pending possible enactment of proposed legislation that could diminish the significance of, but would not moot, these appeals.

4. *Invalidating "Growth Share" Methodology for Allocating Prospective Need for Affordable Housing*

One of the primary grounds upon which we invalidated substantial portions of the original third round rules was COAH's use of a "growth share" methodology to allocate the responsibility for the prospective need for affordable housing to municipalities, rather than assigning a specific numerical prospective need obligation to every municipality located in a growth area, as the first and second round rules had done. *See In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 23–24, 29–30, 49–50, 914 *A.*2d 348.

We invalidated the growth share methodology incorporated in the original third round rules on two grounds. First, we concluded that the record did not contain reliable data showing that "the

State as a whole, and ... each region within the State, [has] sufficient vacant developable land within growth areas to enable the [growth share] ratios to generate enough housing to meet the need[,]" and that without such data, "COAH cannot reasonably assume that its growth share methodology will provide a realistic opportunity to meet the statewide and regional need." *Id.* at 54, 914 *A.*2d 348. Therefore, we ruled that "the growth share methodology can be valid only if COAH has data from which it can reasonably conclude that the allocation formula can result in satisfaction of the statewide need." *Ibid.*

Second, and more fundamentally, we concluded that the growth share methodology adopted in the original third round rules was invalid because it allowed a municipality to avoid any substantial responsibility for satisfying its obligations to provide affordable housing by adopting land use regulations that discourage growth:

[T]he growth share approach encourages municipalities to adopt master plans and zoning ordinances that retard growth, in order to minimize the municipality's fair share allocation.... "Under growth share, a municipality determines where and how much it will grow, knowing that if it chooses to grow, it has an obligation to provide affordable housing as part of the growth." ... [A]s pointed out in comments to COAH, prior experience "has documented that if permitted to do so, municipalities are likely to utilize methodologies that are self-serving and calculated to minimize municipal housing obligations." The Court has recognized that municipalities will adopt land use regulations to minimize affordable housing obligations if permitted to do so. That is why the Court [in *Mount Laurel II* ] rejected the "simpler" approach of allocating a municipality's fair share based on the municipality's own growth projections.

... We agree with appellants that under the growth share approach currently embodied in the COAH regulations, a municipality may control its destiny by adopting measures to discourage or retard residential and non-residential development, simply by "downsizing" remaining developable land.

Any growth share approach must place some check on municipal discretion. The rules, as they currently exist, permit municipalities with substantial amounts of vacant developable land and access to job opportunities in nearby municipalities to adopt master plans and zoning ordinances that allow for little growth, and thereby a small fair share obligation.... If municipalities with substantial amounts of vacant land and access to infrastructure can decide for themselves whether and how much to grow, it is highly likely that housing opportunity will fall far short of identified housing need. Therefore, the current growth share approach violates both the *Mount Laurel* doctrine and the FHA.

[*Id.* at 55–56, 914 *A.*2d 348 (citations omitted).]

COAH's consultants conducted an extensive vacant land study to address the part of our prior opinion which concluded that such an analysis was a prerequisite to a determination of the validity of COAH's growth share methodology. This study concluded that "there is sufficient vacant land and remaining development and redevelopment capacity in growth areas of the State as a whole and in each of the COAH Regions, to support the use of a growth-share methodology and growth-share ratios for distributing affordable housing needs." 40 *N.J.R.* 5965(a), 6099 (Oct. 20, 2008).

A number of appellants argue that COAH's vacant land study was inadequate and that the conclusions it reached were erroneous. We have no need to address those arguments because we conclude that even if the vacant land study accurately identified the available vacant developable land in the State, the growth share methodology contained in the revised third round rules is invalid because it allows a municipality to avoid any significant obligation for satisfying the prospective need for affordable housing by adopting land use regulations that discourage growth.

In the revised third round rules, COAH has made projections of the number of housing units that will be built, and the number of jobs that will result from new non-residential development, in each municipality between 1999 and 2018. *See N.J.A.C.* 5:97–2.2(d), – 2.4(a), and App. F. Based upon these projected growth figures, COAH has assigned each municipality a housing obligation proportional to the projected growth within the municipality—one unit of housing obligation for each five units of projected growth in the number of housing units and one unit of housing obligation for every sixteen jobs projected to be created. *N.J.A.C.* 5:97–2.2(d).

On an initial review, the modified version of the growth share methodology adopted in the third round rules may appear to have eliminated the power of municipalities to relieve themselves of the obligation of providing any significant amount of affordable housing by adopting land use regulations that discourage growth. *N.J.A.C.* 5:97–2.5(e) provides:

If the actual growth share obligation determined in (c) above is less than the growth share obligation projected pursuant to *N.J.A.C.* 5:97–2.4, the municipality shall continue to provide a realistic opportunity for affordable housing to address the projected growth share, through inclusionary zoning or any of the mechanisms permitted by *N.J.A.C.* 5:97–6.

Similarly, *N.J.A.C.* 5:97–2.2(e) provides in pertinent part:

[I]f the actual growth share obligation is less than the projected growth share obligation, the municipality shall continue to provide a realistic opportunity for affordable housing to plan for the projected growth share through inclusionary zoning or any of the mechanisms permitted by *N.J.A.C.* 5:97–6.

Considered in isolation, these sections would seem to indicate that a municipality must provide a realistic opportunity for its full "projected growth share" of affordable housing even if its "actual growth share obligation," as determined by the actual increase in the numbers of residences and jobs in the municipality, is less than the projected growth share.

However, a review of other sections of the rules and COAH's statements of policy indicate that this is not COAH's intent, and that COAH plans to limit municipal obligations to satisfy the prospective need for affordable housing to the number of units determined by actual growth rather than COAH's projected growth calculations. Appendix A to the third round substantive rules, *N.J.A.C.* 5:97, entitled "Growth Share Ratio Methodology," states:

*[M]unicipalities incur obligations to provide affordable housing only when and to the extent growth occurs.* Each municipality's current round affordable housing obligation is based on actual growth while maintaining zoning based on projections to establish a realistic opportunity for affordable housing.

[Emphasis added.]

The means by which COAH may relieve a municipality of the obligation to provide any affordable housing beyond its actual growth share is provided by the third round procedural rules. One of those rules provides that COAH's substantive certification of a municipality's affordable housing plan shall be subject to biennial review. *N.J.A.C.* 5:96–10.1(a). One purpose of this review is "to verify that the construction or provision of affordable housing has been in proportion to the actual residential growth and employment growth in the municipality. . . ." *Ibid.* Another

procedural rule provides that "[a]ny person may request a waiver from a specific requirement of [COAH's] rules at any time." *N.J.A.C.* 5:96–15.1.

The availability of COAH's biennial review of municipal affordable housing plans and COAH's power to waive the requirements of its own rules as procedural vehicles for COAH to limit a municipality's affordable housing obligation to its actual growth share is confirmed by COAH's responses to public comments regarding the revised third round rules:

> The projection of growth share is to be used as a planning tool to establish reasonable targets. Municipalities will be required to zone or provide other mechanisms pursuant to *N.J.A.C.* 5:97–6 in keeping with their projections. *The actual obligation will be determined based upon what actually occurs and adjustments will be made during biennial plan reviews.*
>
> [40 *N.J.R.* 5965(a), 5994 (Oct. 20, 2008) (emphasis added).]

In response to a comment that *N.J.A.C.* 5:97–2.5(e) "would require ... a municipality [to] provide for the number of affordable units projected by COAH ... even if the actual amount of residential and non-residential development occurring in the town results in a lower obligation than projected by COAH," COAH stated:

> [COAH] will consider waivers to its regulations pursuant to the waiver criteria enumerated in *N.J.A.C.* 5:96–15.... The projection of growth share is to be used as a planning tool to establish reasonable targets. Municipalities will be required to zone or provide other mechanisms pursuant to *N.J.A.C.* 5:97–6 in keeping with their projections. *The actual obligation will be determined based upon what actually occurs and adjustments will be made during biennial plan reviews.* [*Ibid.* (emphasis added).]

Moreover, COAH has reaffirmed in its answering brief that "under growth share, the obligation to construct [affordable housing] does not arise unless and until the growth occurs[,]" and that a municipality only has to meet its projected affordable housing obligation during the period of substantive certification "should the growth occur." Therefore, even though, considered in isolation, *N.J.A.C.* 5:97–2.5(e) and *N.J.A.C.* 5:97–2.2(e) might seem to indicate that a municipality must provide for its full "projected growth share," Appendix A to *N.J.A.C.* 5:97 and COAH's responses to public comments regarding the proposed revised third round rules indicate that COAH will administer the rule in a manner that

requires municipalities to provide only their actual growth share obligation.

We have no reason to doubt that COAH will administer the third round rules in the manner it has publicly indicated it will do. Moreover, if COAH fails to carry through with its publicly stated intentions regarding the administration of the revised third round growth share methodology, its denial of a municipality's application for a waiver of the obligation to provide for the municipality's full projected growth share of affordable housing undoubtedly would be appealed to this court on that basis. Therefore, we conclude that the growth share methodology for determining a municipality's share of the prospective regional need for affordable housing set forth in the revised third round rules, like the growth share methodology set forth in the original third round rules, "permit[s] municipalities with substantial amounts of vacant developable land and access to job opportunities in nearby municipalities to adopt master plans and zoning ordinances that allow for little growth, and thereby a small fair share obligation," *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 56, 914 *A.*2d 348, and is thus invalid for the reasons set forth in our prior opinion.

5. *Remedy for Declaration of Invalidity of "Growth Share" Methodology: Order Requiring COAH to Use Methodology Similar to Those Used to Determine Prospective Need in Prior Rounds*

■ Our prior opinion concluded that "the growth share approach, *as presently constituted,* is inconsistent with both the *Mount Laurel* doctrine as articulated by the Supreme Court and as codified in the FHA," *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 53, 914 *A.*2d 348 (emphasis added), but did not preclude COAH from adopting another version of the growth share methodology that corrected the problems we identified in the original version. Because we have now concluded that COAH's revised version of the growth share methodology has the same basic deficiencies as the original version, COAH must again adopt

revised third round rules for determining the prospective need for affordable housing.

At this point, we do not believe it would be appropriate to allow COAH to adopt yet another methodology for determining the allocation of prospective need that uses a growth share approach. More than a decade has elapsed since expiration of the second round rules, during which COAH has operated without valid third round rules. This regulatory vacuum must be filled. The most reasonable means of achieving this objective is to require COAH to adopt third round rules that incorporate a methodology similar to the methodology set forth in the first and second round rules, which were approved by the courts in most respects.

Our conclusion that COAH should be required to return to such a previously-approved methodology to prevent further delay in the adoption of valid third round rules is reinforced by our doubts whether any growth share methodology would be valid under existing law. In *Mount Laurel II*, the Court pointedly rejected any methodology for determining allocations of municipal affordable housing obligations that was substantially dependent upon individual municipalities' decisions as to whether to grow:

> While it would be simpler in these cases to calculate a municipality's fair share by determining *its own* probable future population (or some variant thereof), such a method would not be consistent with the constitutional obligation (although it is a factor that could be considered in a fair share calculation in the absence of other proof). Municipal population projections are based on many factors, but in no case that we know of do they include a value judgment that such municipality should bear its fair share of the region's lower income housing need. In fact, in most cases, we believe, one of the factors necessarily involved in such municipal population projections is the prior and probable future effect of the municipality's exclusionary zoning. If, because of that exclusionary zoning, a suburban municipality with substantial developable land has a very, very small probable growth as shown by the most reliable population projections (resulting in part from its very small past growth cased by exclusionary zoning), it should not be allowed to evade its obligation by basing its fair share of the lower income housing need on that small projected population growth. On the other hand, when that municipality is considered as part of the region and the region's population growth is projected, a value judgment is made, based upon the *Mount Laurel* obligation, that may result in a substantially greater fair share for that municipality and indeed may have the effect of changing what would otherwise be the population projection for that municipality.

[92 *N.J.* at 257–58, 456 *A.*2d 390.]

We recognize that more than twenty-seven years have elapsed since the Court's decision in *Mount Laurel II.* It may be that the time has arrived for reconsideration of the part of *Mount Laurel II* that appears to militate against the use of any growth share methodology for determining a municipality's affordable housing obligations. However, this court has no authority to undertake such reconsideration; we are bound by the decisions of our Supreme Court.

Therefore, we are unwilling to allow COAH to further delay the discharge of its duty to adopt valid third round rules by undertaking to devise yet another methodology for allocating municipal obligations for the prospective need for affordable housing that relies upon a growth share approach. Instead, we direct COAH to adopt new third round rules that use a methodology for determining prospective need similar to the ones used in the first and second rounds.

6. *Inappropriateness of Requiring COAH to Continue Use of Projected Statewide and Regional Prospective Need Determined Under Invalid Revised Third Round Rules*

We next consider the effect of our invalidation of the rules governing allocation of prospective need based on a growth share methodology upon COAH's determinations of projected statewide and regional prospective need for the period from 1999 to 2018. Fair Share suggests that even though, as we have now held, the growth share approach is invalid as a methodology for allocating prospective need to individual municipalities, COAH's determination of the projected overall statewide and regional prospective need based on that methodology should be used in connection with any new revised third round rules. We reject this suggestion and conclude that there must be a new determination of overall statewide and regional prospective need based on a methodology similar to the methodologies used in the first and second round rules.

COAH's use of the same methodology to determine both projected growth and actual growth share obligations was apparently designed to establish an integrated system for determination of projected statewide and regional prospective need, allocation of that need to individual municipalities, and satisfaction of the need through municipal compliance plans. Consequently, we cannot simply assume COAH would have used this same methodology for determining statewide and regional prospective need if it had known that the portions of the third round rules dealing with prospective need would be declared invalid for use in allocating responsibility for satisfaction of that obligation to individual municipalities. Moreover, it would constitute an unduly expansive exercise of judicial power to require COAH to use prospective need numbers, which were generated as one component of an integrated methodology we have invalidated, as a component of a new methodology, to be derived from the methodologies used in the first and second round rules, which COAH will now be required to adopt.

Our unwillingness to require COAH to use the statewide and regional prospective need numbers generated by the methodology under which COAH determined projected statewide and regional growth for the period from 1999 to 2018 in new revised third round rules is reinforced by the substantial issues raised by the National Association of Industrial and Office Properties and other appellants regarding the reasonableness of the methodology and reliability of the data COAH used in calculating projected statewide and regional growth. Those issues include the appropriateness of the projected new jobs component, COAH's failure to compare the data it used to calculate prospective need with other available data, the appropriateness of including demolitions of residential units for the purpose of rebuilding in calculating growth share, and the reasonableness of COAH's projections of both housing and job growth based on stale data.

We have no need in deciding these appeals to rule upon these or any of the other issues appellants raise concerning COAH's pro-

jected statewide and regional prospective need calculations. We only note that some of these issues are substantial and could have resulted in invalidation of the prospective need components of the third round rules even if the growth share methodology had been found to be valid. Furthermore, the data COAH used in calculating prospective need has become even more stale during the more than two-year period these appeals have been pending.

Therefore, we direct COAH, in devising new revised third round rules, to redetermine prospective need based on a methodology similar to the ones used in the first and second round rules and up-to-date data.

7. *Invalidating N.J.A.C. 5:97–3.2(a)(4)(iv), Which Authorizes Substantive Certification of Compliance Plans that Rely Upon Municipality–Sponsored Affordable Housing Projects Without Specifying Location of Sites or Source of Funding*

Several appellants argue that a municipality may obtain substantive certification under *N.J.A.C.* 5:97–3.2(a)(4)(iv), based on a compliance plan that proposes to satisfy some or all of its affordable housing obligations by municipally-sponsored 100% affordable housing projects, without any specifics or supporting documentation, such as the location of the project, evidence the municipality controls the site, suitability of the site, source of funds to construct and operate the project, or the identity of the entities that will construct and operate the project. These appellants argue that the grant of substantive certification based on such a compliance plan would violate the FHA, which requires COAH to find, before granting substantive certification, that a plan makes it "realistically possible" for a municipality to satisfy its affordable housing obligations. *N.J.S.A.* 52:27D–314(b).

COAH's sole justification for authorizing the grant of substantive certification based on such an amorphous plan for satisfaction of a municipality's affordable housing obligations is that "under [its] growth share [methodology], the obligation to construct does not arise unless and until the growth occurs," and therefore

*N.J.A.C.* 5:97–3.2(a)(4)(iv) "was designed to address the limited area of 100% affordable housing programs, and the issue of the possible expenditure of municipal funds, by not requiring that a site be identified or a funding commitment be made if actual growth is not occurring." Thus, COAH's justification for *N.J.A.C.* 5:97–3.2(a)(4)(iv) is wholly dependent upon the validity of the growth share methodology for determining prospective need. We have concluded for the reasons set forth in section four of this opinion that that methodology is invalid. It follows that *N.J.A.C.* 5:97–3.2(a)(4)(iv) is also invalid.

8. *Invalidating Parts of Revised Third Round Rules that Do Not Provide Sufficient Incentives for Developers to Construct Inclusionary Development*

■ Another of the primary grounds upon which we invalidated substantial parts of COAH's original third round rules was that those rules, specifically *N.J.A.C.* 5:94–4.4, compelled developers to provide affordable housing without any compensating benefit. *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 67–75, 914 *A.2d* 348. In concluding that *N.J.A.C.* 5:94–4.4 was invalid, we stated:

> We conclude that the *Mount Laurel* doctrine, as articulated in *Mount Laurel II* and *Toll Bros.*,[5] and as codified by the FHA, requires municipalities to provide incentives to developers to construct affordable housing. Land use ordinances requiring all developers to provide some affordable housing conflict with the essence of the *Mount Laurel* doctrine, which requires that municipal land use ordinances create a realistic opportunity. *N.J.A.C.* 5:94–4.4 discourages development, even in growth areas where development is supposed to occur because it makes development both more expensive and less predictable. The rules allow municipalities in growth areas to discourage development of any kind, and therefore the development of any affordable housing, by zoning selected areas for uncompensated inclusionary development. . . .
>
> History has shown that many municipalities believe that it is in their best financial interest to exclude low- and moderate-income households, especially households with children. Permitting municipalities to demand that developers build affordable housing without any additional incentives provides municipalities with an effective tool to exclude the poor by combining an affordable housing requirement with large-lot zoning. . . . A regulatory regime that relies on develop-

---

5 *Toll Bros. v. Twp. of West Windsor,* 173 *N.J.* 502, 803 *A.2d* 53 (2002).

ers to incur the uncompensated expense of providing affordable housing is unlikely to result in municipal zoning ordinances that make it realistically probable that the statewide need for affordable housing can be met.

[*Id.* at 73–74, 914 *A.*2d 348 (citations omitted).]

Since the issuance of our prior opinion, the Legislature has expressly recognized the need for a municipality to provide incentives to residential developers for the construction of affordable housing, including increased densities. In 2008, the Legislature enacted a new subsection of the FHA, which states:

Whenever affordable housing units are proposed to be provided through an inclusionary development, a municipality shall provide, through its zoning powers, incentives to the developer, which shall include increased densities and reduced costs, in accordance with the regulations of the council and this subsection. [*N.J.S.A.* 52:27D–311(h).]

COAH contends that it satisfied the requirement of our prior opinion and *N.J.S.A.* 52:27D–311(h) to provide adequate incentives for the construction of affordable housing by adopting *N.J.A.C.* 5:97–6.4(a), which provides in pertinent part:

Affordable housing units proposed through inclusionary development shall be provided through zoning for development that includes a financial incentive to produce the affordable housing, including but not limited to increased densities and reduced costs to the developer.

However, *N.J.A.C.* 5:97–6.4(b)(3)(i) provides that COAH "shall generally accept" municipal zoning as satisfying the requirement of "providing a realistic opportunity for the creation of affordable housing" if the zoning "provides for the presumptive densities and set-asides" set forth in the various subsections of *N.J.A.C.* 5:97–6.4(b)(2). Therefore, the determination of whether the third round rules provide adequate incentives to developers to construct affordable housing depends on the reasonableness of those presumptive densities and set-asides.

In Planning Area 1, COAH requires a presumptive minimum gross density of eight units per acre and a presumptive maximum set-aside of 25%. *N.J.A.C.* 5:97–6.4(b)(2)(i). In Planning Area 2 and designated centers, COAH requires a presumptive minimum gross density of six units per acre and a presumptive maximum 25% set-aside. *N.J.A.C.* 5:97–6.4(b)(2)(ii). In Planning Areas

outside of Planning Areas 1 and 2, COAH requires a presumptive minimum gross density of four units per acre and a presumptive maximum set-aside of 25%. *N.J.A.C.* 5:97–6.4(b)(2)(iii). COAH also requires specified minimum gross densities and presumptive maximum set-asides in areas that do not have sewer service and urban centers. *N.J.A.C.* 5:97–6.4(b)(2)(iv),(v). In addition, if a developer proposes to construct rental housing, COAH requires a presumptive minimum density of twelve units per acre and a presumptive maximum affordable housing set-aside of 20%. *N.J.A.C.* 5:97–6.4(b)(6)(i).

There is no basis in the reports of COAH's outside consultants or prior experience in the administration of the *Mount Laurel* doctrine for concluding that COAH's revised third round rules provide sufficient incentives for developers to construct residential developments at the presumptive minimum densities and maximum set-asides. Where the presumptive minimum densities required by the revised third round rules do not exceed the densities permitted under existing zoning, they obviously provide no incentive for construction of affordable housing. Furthermore, even where the presumptive minimum densities exceed the densities permitted under existing zoning, they do not require municipalities to permit the kind of high density residential development ordinarily required to establish the financial feasibility of developers constructing a significant amount of affordable housing. The presumptive minimum gross density of eight units per acre applies only in Planning Area 1, *N.J.A.C.* 5:97–6.4(b)(2)(i), which covers the State's most urbanized communities. *See In re Coastal Permit Program Rules*, 354 *N.J.Super.* 293, 321, 807 *A.*2d 198 (App. Div.2002). A presumptive minimum gross density of six units per acre applies in Planning Area 2, *N.J.A.C.* 5:97–6.4(b)(2)(ii), and a presumptive minimum gross density of merely four units per acre is required in the sewered sections of Planning Areas 3, 4 and 5. *N.J.A.C.* 5:97–6.4(b)(2)(iii). Moreover, a municipality is only required to permit attached single family housing when "necessary to accommodate" these densities. *N.J.A.C.* 5:97–6.4(b)(4). Thus, in parts of the State, a municipality may satisfy its affordable

housing obligations by zoning only for detached single-family houses on quarter-acre lots, which is an expensive form of residential development even if the affordable units are modest in size.

Moreover, the revised third round regulations authorize a municipality to require developers to provide a 25% set-aside of affordable housing in those parts of the State. This would mean a municipality could require a developer planning to construct eighty residential units on quarter-acre lots to include twenty units of affordable housing in its development. In addition, the revised third round rules require a development's affordable units to be priced at a level that, on average, will be affordable to a household earning 55% of the regional median household income, *N.J.A.C.* 5:97–9.1(a) (incorporating affordability standards of *N.J.A.C.* 5:80–26.3(e)), which is a reduction from the previous standard of 57.5% of regional median household income. *N.J.A.C.* 5:93–7.4(b).

We take judicial notice of the fact that a 20% set-aside requirement has been considered the norm in the administration of the *Mount Laurel* doctrine and that experts in the field have expressed skepticism whether developers will be motivated to construct residential developments with affordable housing set-aside requirements any higher than 20%, except perhaps in a few municipalities where market-rate units can command premium prices. *See Urban League of Essex County v. Twp. of Mahwah,* 207 *N.J.Super.* 169, 204–06, 504 *A.*2d 66 (Law Div.1984). Current economic conditions and regulatory requirements for new housing construction make it even more unlikely than in the past that municipal zoning requiring more than 20% of new residential units to be affordable to lower income households would provide a realistic opportunity for construction of a substantial number of such units.

In response to the Builders Association's objections that the minimum densities and maximum set-asides required by the proposed revised third round rules were not economically feasible, COAH cited Massachusetts as an example of a jurisdiction that

requires 25% set-asides. Response to Comment on *N.J.A.C.* 5:97–6.4, 40 *N.J.R.* 5965(a), 6014 (Oct. 20, 2008). However, as COAH's housing consultant noted, the Massachusetts program is not comparable to New Jersey's affordable housing requirements under the *Mount Laurel* doctrine and the FHA, because Massachusetts only requires units to be affordable to *moderate* income households (those with incomes at or below 80% of the regional median income), and not, as in New Jersey, also low income households (those with income at or below 50% of regional median income). *N.J.A.C.* 5:97, *App. F: Inclusionary Housing: Lessons from the National Experience*, 40 *N.J.R.* 2690(a), 3078–79 (June 2, 2008).

In response to the Builders Association's objections, COAH also suggested that a developer which claims that residential development is not economically feasible at the densities and set-asides prescribed by the third round rules can apply to COAH for a waiver of those standards. Response to Comment on *N.J.A.C.* 5:97–6.4, 40 *N.J.R.* 5965(a), 6014 (Oct. 20, 2008). However, COAH's own housing consultant recommended against such a project-by-project determination of the permitted densities and required percentages of affordable units:

Inclusionary housing programs function best when they have a clear and predictable affordable housing requirement that market actors can take into account when they buy land and choose whether to invest funds in a deal.

[*N.J.A.C.* 5:97, *App. F: Inclusionary Housing: Lessons from the National Experience*, 40 *N.J.R.* 3088 (June 2, 2008).]

Our courts have also recognized the need for "bright line standards" for determining the obligations of municipalities under the *Mount Laurel* doctrine. *See J.W. Field Co. v. Twp. of Franklin*, 204 *N.J.Super.* 445, 452–53, 499 *A.*2d 251 (Law Div.1985). The inclusion in the third round rules of presumptive minimum gross densities and presumptive maximum set-asides that do not appear to create a realistic opportunity for the construction of affordable housing in most circumstances, and consequently would require frequent resort to a waiver procedure, do not provide such workable "bright line standards."

Therefore, we conclude that the revised third round rules, like the original third round rules, do not provide sufficient incentives for the construction of inclusionary developments to create a realistic opportunity for any substantial amount of affordable housing.

9. *Invalidating N.J.A.C. 5:97–3.5, Which Authorizes Rental Bonus Credits for Prior Round Obligations*

■ SJM Communities argues that *N.J.A.C.* 5:97–3.5, as amended in October 2008, violates the *Mount Laurel* doctrine by authorizing municipalities to reduce their prior round affordable housing obligations through the award of rental bonus credits for rental units that were never built.

In its original form as adopted in June 2008, *N.J.A.C.* 5:97–3.5(a) provided in pertinent part:

A municipality may receive two units of credit for each rental unit addressing its prior round rental obligation, provided the unit was created in the municipality and occupied on or after December 15, 1986, is not age-restricted and has controls on affordability for at least 30 years.

[40 *N.J.R.* 2690(a), 2893 (June 2, 2008).]

In addition, *N.J.A.C.* 5:97–3.5(b) provided for the award of 1.33 units of credit for age-restricted affordable rental units, subject to the same conditions. *Ibid.* Thus, under this original form of *N.J.A.C.* 5:97–3.5, a municipality was only entitled to rental bonus credits for affordable rental units that had been actually "created in the municipality."

However, the amendments to the revised third round rules COAH adopted in October 2008 included a new version of *N.J.A.C.* 5:97–3.5, which eliminated the requirement that an affordable rental unit must have been actually created for a municipality to be entitled to a rental bonus. In its amended form, *N.J.A.C.* 5:97–3.5(a) provides in pertinent part:

A municipality may receive two units of credit for each rental unit addressing its prior round rental obligation, provided the unit was *or will be created* and occupied in the municipality *or received preliminary or final approval,* on or after December 15, 1986, is not age-restricted and has controls on affordability for at least 30 years.

[40 *N.J.R.* 5965(a), 6057 (Oct. 20, 2008) (emphasis added).]

*N.J.A.C.* 5:97–3.5(b), which provides a 1.33 rental bonus credit for age-restricted rental units, was also amended to eliminate the requirement that a unit must have been actually created for a municipality to obtain a rental bonus credit. *Ibid.* Thus, under the amended version of *N.J.A.C.* 5:97–3.5, a municipality may be entitled to a rental bonus credit for its prior round affordable housing obligations for the period from 1986 to 1999 even though a proposed rental unit was not constructed within that period or the period of COAH's substantive certification of the municipality's plan for compliance with those prior round obligations.

COAH's prior round rules only allowed rental bonus credits for affordable rental units that were constructed within a reasonable period. *N.J.A.C.* 5:93–5.15(d), which governed rental bonus credits in the second round, states in relevant part:

> [COAH] shall grant a rental bonus for rental units that are constructed. . . . [COAH] may also grant the rental bonus prior to construction when it determines that the municipality has provided or received a firm commitment for the construction of rental units. A municipality may lose the benefit of the rental bonus granted in advance of the actual construction of the rental units if the municipality has not constructed the rental units within the time periods established as a condition of substantive certification; or granted preliminary or final approval for the construction of the rental units (where a developer agreed to construct the rental units). A municipality may also lose the benefit of a rental bonus if the preliminary or final approval is no longer valid or if the developer has abandoned the development.

Although this rule allowed a municipality to claim credit for an affordable rental unit that had not yet been built, it also provided that the credit would be lost if the unit was not constructed within the period established as a condition of substantive certification. *N.J.A.C.* 5:97–3.5, as amended in October 2008, contains no comparable limitation upon the effective period of a rental bonus credit. Thus, under *N.J.A.C.* 5:97–3.5, a rental bonus credit against prior round obligations can continue indefinitely without the proposed affordable rental unit actually being constructed.

The rationale under which the validity of rental bonus credits have been upheld, even though they decrease the total number of affordable housing units that are created, is to "encourag[e] the

construction of more rental housing." *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 82, 914 *A.*2d 348. This salutary objective is not served by allowing a municipality to claim a rental bonus credit for a planned affordable rental unit that still has not been constructed more than a decade after expiration of the prior round periods for which a municipality has unmet affordable housing obligations. Therefore, *N.J.A.C.* 5:97–3.5 is invalid.

10. *Upholding N.J.A.C. 5:97–3.18 and –3.19, Which Authorize "Smart Growth" and "Redevelopment" Bonuses*

█ Fair Share challenges the validity of the revised third round rules that allow new forms of "bonuses" to achieve compliance with municipal affordable housing obligations. One is a "Smart Growth" bonus, which awards municipalities "1.33 units of credit for each affordable housing unit addressing its growth share obligation ... that is included in a Transit Oriented Development in a Planning Area 1, 2 or a designated center," *N.J.A.C.* 5:97–3.18; and another is a "Redevelopment" bonus, which awards municipalities "1.33 units of credit for each affordable housing unit addressing its growth share obligation ... that is included in a designated redevelopment area or rehabilitation area pursuant to the Local Redevelopment and Housing Law, *N.J.S.A.* 40A:12A–1 *et seq* ...." *N.J.A.C.* 5:97–3.19.

We have previously upheld the validity of the forms of bonuses COAH authorized in its prior round and original third round rules. In *Calton Homes, supra,* 244 *N.J.Super.* at 456–58, 582 *A.*2d 1024, we upheld the validity of a rule providing bonus credits for affordable rental units. We described the rental bonus rule as a reasonable device "to encourage construction of rental housing." *Id.* at 457, 582 *A.*2d 1024. We also observed:

> [COAH] is granted wide discretion in determining how to carry out the essential purpose of the [FHA], which is the creation of a variety of affordable housing, including rental housing. Because the rental bonus is a reasonable component of a scheme reasonably designed to serve the Legislature's purpose it should be sustained.
>
> [*Id.* at 458, 582 *A.*2d 1024 (citations omitted).]

In *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 81–84, 914 *A.*2d 348, we affirmed the validity of the rental bonus rule included in the original third round rules and a new bonus credit for residential units that are affordable to very poor households, which are defined as households earning 30% or less of median income. In upholding the award of bonus credits for residences affordable to such households, we stated: "If it is reasonable to award bonus credits for rental units to offset the increased subsidies necessary to create more rental housing in the State, then it is equally reasonable for COAH to provide incentives for housing for the very poor." *Id.* at 83, 914 *A.*2d 348.

The revised third round rules also provide bonus credits for affordable rental units and residential units affordable to the very poor. *N.J.A.C.* 5:97–3.5, 3.6, 3.7. We have invalidated the amended version of *N.J.A.C.* 5:93–3.5, which governs rental bonuses for prior round obligations, for the reasons set forth in section nine of this opinion. However, no party challenges *N.J.A.C.* 5:97–3.6, which governs rental bonuses for the satisfaction of prospective need, or *N.J.A.C.* 5:97–3.7, which governs bonuses for construction of affordable housing for very low income households. Fair Share's challenge is limited to the new forms of bonuses authorized by the revised rules.

The "Smart Growth" bonus provided by *N.J.A.C.* 5:97–3.18 may only be claimed for affordable units constructed "in a Transit Oriented Development in Planning Area 1, 2 or a designated center." The evident purpose of this bonus is to encourage construction of affordable housing in areas designated as most desirable for development in the State Development and Redevelopment Plan adopted by the State Planning Commission pursuant to the State Planning Act, *N.J.S.A.* 52:18A–196 to –207, specifically *N.J.S.A.* 52:18A–199(a), –200, –202.

The "Redevelopment" bonus provided by *N.J.A.C.* 5:97–3.19 may be claimed only for affordable units constructed in a "designated redevelopment area or rehabilitation area pursuant to the Local Redevelopment and Housing Law, *N.J.S.A.* 40A:12A–1 *et*

*seq* ...." The evident purpose of this bonus is to encourage construction of affordable housing as part of any redevelopment plan.

The FHA expressly directs COAH, in performing its statutory duties, to "give appropriate weight to ... implementation of the State Development and Redevelopment Plan prepared pursuant to [*N.J.S.A.* 52:18A–196 to –207]." *N.J.S.A.* 52:27D–307(e). In addition, the FHA states that "[s]ince the urban areas are vitally important to the State, construction, conversion and rehabilitation of housing in our urban centers should be encouraged." *N.J.S.A.* 52:27D–302(g). These legislative policies are promoted by the third round rules providing for "Smart Growth" and "Redevelopment" bonuses. Therefore, we conclude that those rules, like the rules providing bonuses for affordable rental units and residential units affordable to very poor households that we upheld in *Calton Homes* and *In re N.J.A.C. 5:94*, are reasonably designed to further important state policies and are therefore valid.

11. *Invalidating N.J.A.C. 5:97–3.17, Which Authorizes "Compliance" Bonuses*

■ Fair Share also challenges the validity of a revised third round rule that establishes another new form of bonus called a "Compliance" bonus. The rule authorizing this bonus provides in pertinent part:

> (a) A municipality may receive two units of credit for each affordable housing unit that has been included in a development that received preliminary or final approval, or was the subject of an executed developer's agreement or redevelopment agreement, between December 20, 2004 and June 2, 2008 when:
>
> 1. The zoning ordinance authorizing the development ... was included as an affordable housing mechanism to address the growth share obligation in a third round petition for substantive certification submitted to Council prior to January 25, 2007, pursuant to *N.J.A.C.* 5:95; [and]
>
> 2. The development approval or executed developer's agreement or redevelopment agreement provides for the affordable housing units to be built on site....
> [*N.J.A.C.* 5:97–3.17.]

Thus, the prerequisite for the award of a bonus under this rule is not a form of development that promotes an important public

policy, such as construction of rental units, housing affordable to very low income households, or housing in areas that have been specifically designated for growth in the State Plan, but solely the circumstance of a preliminary or final development approval or execution of a development or redevelopment agreement during the period from December 20, 2004 to June 2, 2008, which was the interim period between the adoption of the original and revised third round rules.

The sole justification COAH offers for this bonus is that municipalities reasonably relied upon the original third round rules. We have no doubt municipalities should not be penalized for relying upon the original rules that we subsequently invalidated. However, any such penalty can be avoided simply by giving municipalities the same credit they would have received if we had upheld the validity of the original rules, which would be a single credit for each unit constructed or approved, rather than the double credit provided by *N.J.A.C.* 5:97–3.17. Therefore, we invalidate *N.J.A.C.* 5:97–3.17.

12. *Upholding COAH's Determination of Prior Round Affordable Housing Obligations*

Under the original third round rules, COAH increased prior round obligations based on data from the 2000 census, which showed that there had been greater household growth during the second round period from 1993 to 1999 than had been projected when the obligations for that period were established, but reduced those increased obligations based on filtering and other secondary sources of affordable housing. *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 45, 914 *A.*2d 348. We invalidated this methodology for determining prior round obligations on the ground that the reductions for filtering rested on "inadequate data." *Id.* at 46, 914 *A.*2d 348.

On remand, COAH decided simply to impose the same prior round obligations it had established as the second round obligations in 1993, without either any increase for the greater than

projected growth during the second round period or any reduction for filtering and other secondary sources. *See* 40 *N.J.R.* 2690(a), 2862 (June 2, 2008). The prior round obligations determined in this manner are set forth in Appendix C to *N.J.A.C.* 5:97.

Fair Share argues that COAH's abandonment of the methodology for determining prior round obligations provided in the original third round rules is inconsistent with our prior opinion. However, that opinion did not direct COAH to retain the same methodology for determining prior round obligations. It only held that if COAH used a methodology that involved a reduction in prior round obligations based on filtering or other secondary sources, it was required to use "the most recent and reliable data available to the agency" in determining such reductions. *In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 46, 914 *A.*2d 348. Therefore, COAH's adoption of a new methodology for determining prior round obligations did not violate the mandate of our remand.

■ Fair Share and ISP also argue that the methodology used to determine prior round obligations in the revised third round rules is arbitrary, capricious, and unreasonable, because it fails to reflect the greater than projected household growth during the 1993–99 second round period. Fair Share and ISP point out that in calculating prior round obligations in the second round rules, COAH reduced those obligations to reflect the less than projected growth during the first round period from 1987 to 1993, and they argue that COAH was required to make the same kind of adjustment when growth was greater than projected during the 1993–99 second round period.

COAH provided the following explanation for establishing the same affordable housing obligations it had established in 1993 as municipalities' second round obligations as the prior round component of third round affordable housing obligations:

The prior round numbers in Appendix C are the unadjusted 1987–99 obligation, first published in 1993. [COAH] made a policy decision not to update the prior round numbers for two main reasons. First, [COAH] recognizes that for towns to participate and proactively produce affordable housing, there needs to be predictability in the process and the towns must be able [to] rely on their substantive

certification. By going back to the unadjusted 1993 number, some towns' prior round obligations have increased and others have decreased. Also, the growth share ratios have increased so substantially, that there is a point at which a municipality will never be able to "catch up" and construct such a large amount of affordable housing.

[40 *N.J.R.* 2690(a), 2860 (June 2, 2008).]

The Supreme Court has repeatedly indicated that courts should extend substantial deference to COAH's determinations of municipal affordable housing obligations. *See, e.g., In re Twp. of Warren, supra,* 132 *N.J.* at 27, 622 *A.*2d 1257; *Van Dalen v. Washington Twp.,* 120 *N.J.* 234, 244–46, 576 *A.*2d 819 (1990).

We consider it appropriate to extend such deference to COAH's determination that the second round affordable housing obligations established in 1993 should be used as the prior round component of affordable housing obligations under the revised third round rules. COAH's rationale of providing municipalities with predictability and the ability to rely upon COAH's substantive certifications of their prior round compliance plans constitutes a reasonable basis for this part of the third round rules. We also note that the use of unadjusted second round affordable housing obligations as the prior round component of the third round obligations results in total prior round obligations of 85,964 units, which is 8,437 more units than the total generated by the methodology used to determine prior round obligations in the original third round rules. For these reasons, we reject Fair Share's challenge to the validity of COAH's determination of prior round obligations.

13. *Upholding COAH's Determination Not to Reallocate Present Need for Affordable Housing in Urban Municipalities to Other Municipalities*

Fair Share challenges the part of the revised third round rules that fails to reallocate any of the present need for affordable housing created by substandard housing in urban municipalities to other municipalities in the region.

This is essentially the same challenge Fair Share made to this part of the original third round rules. In rejecting that challenge, we stated:

In adopting the third round rules, COAH characterized reallocated present need as the "replacement of a primarily urban rehabilitation obligation with a primarily suburban New Construction Obligation." 36 *N.J.R.* 5790 (December 20, 2004). COAH identified two undesirable results created by the round one and round two methodology: (1) it substantially increased the new construction obligation of many municipalities that had their own substantial rehabilitation obligations; and (2) older, suburban communities that were already built up were assigned a substantial new construction obligation that could not be met; municipalities lacking vacant land could not develop a "realistic" fair share plan because the new construction obligation could not realistically be satisfied without any land to build new housing. *Ibid.* COAH also estimated that housing need in the inner cities was slightly below what it was in round two, and COAH would also require that vacant rental rehabilitation units be affirmatively marketed within the region. *Ibid.*

We conclude that the *Mount Laurel* doctrine does not necessarily require COAH to allocate excess housing need existing in the inner cities to suburban municipalities. Not only does the regulation of any administrative agency carry a presumption of validity, but the Court has signaled its intent to allow COAH broad discretion in implementing the *Mount Laurel* doctrine. . . .

This court should defer to COAH's experience in administering the round one and round two rules, which show that reallocating present need was not a practical solution to the lack of affordable housing in suburban growth areas because: (1) so many suburbs already had to address significant housing deterioration, and (2) so much of the reallocated present need was assigned to suburban municipalities that lacked sufficient vacant developable land. The Court has stated: "Revisions, adjustments, fine tuning—all of the techniques available to an administrative agency—can be implemented on a statewide basis as experience teaches [COAH] what works and what does not." [*Hills, supra,* 103 *N.J.* at 37, 510 *A.2d* 621]. . . . If, as COAH predicts, a growth share approach will actually result in the construction of more affordable housing, then we do not believe that excess present need in urban municipalities must be reallocated to other municipalities.

We disagree with appellants that eliminating reallocated present need unfairly burdens inner cities. If most of the new jobs and new housing in the State do not occur in distressed inner cities, then affirmatively marketing the housing that does become available in suburban growth areas will not require cities to tax their limited sources by providing affordable housing. If, on the other hand, job growth and new housing development does take place in the inner cities, then those municipalities will have greater resources to meet the housing needs of the poor. [*In re N.J.A.C. 5:94, supra,* 390 *N.J.Super.* at 59–60, 914 *A.2d* 348.]

Fair Share argues that we should reconsider the part of our prior opinion that rejected its challenge to COAH's failure to reallocate any of the present need for affordable housing in urban

municipalities, primarily because COAH has now determined that present need is double what it had been determined to be in the original third round rules. Despite this reassessment of the magnitude of present need, we reaffirm the validity of the part of the third round rules that does not reallocate any of that need. However, for the guidance of COAH on remand, we note that the magnitude of urban municipalities' obligations for the present need for affordable housing due to existing substandard housing creates substantial doubt whether it is appropriate to assign any share of the responsibility for prospective need to those municipalities.

14. *Rejecting Argument that Third Round Rules Improperly Require Expenditure of Municipal Revenues to Satisfy Affordable Housing Obligations*

The League and a number of municipal appellants argue that the third round rules impermissibly require municipalities to expend municipal revenues to satisfy their affordable housing obligations. This argument is based upon *N.J.S.A.* 52:27D–311(d), which provides: "Nothing in [the FHA] shall require a municipality to raise or expend municipal revenues in order to provide low and moderate income housing." The League and municipal appellants contend that the construction of both market-rate and affordable housing units in inclusionary developments will generate substantial additional demand for municipal services, including trash collection, road maintenance, public safety, and in particular, schools, and that the real estate taxes imposed upon owners of new units in inclusionary developments cannot reasonably be expected to fully offset the costs of those additional services. These appellants argue that the difference between the cost of the additional municipal services that will be generated as a result of construction of inclusionary developments and the additional taxes that will be paid by residents of those developments violates the prohibition of *N.J.S.A.* 52:27D–311(d) against requiring "a municipality to raise or expend municipal revenues in order to provide low and moderate income housing."

We conclude that any incidental impacts of inclusionary housing developments upon municipal finances does not constitute a mandated expenditure of municipal revenues prohibited by *N.J.S.A.* 52:27D–311(d). Almost all residential developments, except those involving very high-end residences, impose greater costs upon the host municipality, particularly school costs, than the additional tax revenues generated by the residences, regardless of whether the development is inclusionary. Indeed, this is the reason many municipalities seek to maximize commercial and minimize residential development.

It was well recognized before enactment of the FHA that the primary device for municipalities to satisfy their affordable housing obligations was the adoption of zoning that provides a realistic opportunity for construction of new housing in inclusionary developments. *See Mount Laurel II, supra,* 92 *N.J.* at 265–74, 456 *A.*2d 390. However, if the prohibition of *N.J.S.A.* 52:27D–311(d) against the mandated expenditure of municipal revenues were construed to extend to any adverse fiscal impact of an inclusionary development, it would effectively negate the use of zoning for such development as a device for achieving compliance with affordable housing obligations. In that event, the FHA would no longer provide an administrative framework for achieving compliance with those obligations, but would instead establish legislative authorization for failing to satisfy affordable housing obligations, which would violate the New Jersey Constitution as interpreted in the *Mount Laurel* decisions.

■ However, a statute should not be given a construction that would raise doubts concerning its constitutionality if it is reasonably susceptible to a construction that would not raise such doubts. *Gallenthin Realty Dev., Inc. v. Borough of Paulsboro,* 191 *N.J.* 344, 359–60, 924 *A.*2d 447 (2007). We are satisfied that *N.J.S.A.* 52:27D–311(d) can be reasonably construed only to prohibit any requirement that a municipality directly expend its revenues to provide affordable housing. Therefore, we adopt this

construction of *N.J.S.A.* 52:27D–311(d) to preserve its constitutionality.

It was well established before enactment of the FHA that municipalities could voluntarily choose to satisfy part or all of their affordable housing obligations by means of subsidized lower-income housing projects and other devices that involve direct expenditures of municipal funds, rather than by inclusionary zoning. *See Mount Laurel II, supra,* 92 *N.J.* at 262–65, 456 *A.*2d 390. The FHA established another device by which municipalities could satisfy part of their affordable housing obligations by direct expenditure of municipal funds, which was the authorization for a municipality to enter into a regional contribution agreement, under which the municipality could satisfy up to 50% of its affordable housing obligation by payment to another municipality of the funds required to construct affordable housing in that municipality. *See N.J.S.A.* 52:27D–312.[6]

The FHA expressly authorized municipalities to expend their revenues for subsidized affordable housing either within their own borders or, through regional contribution agreements, in other municipalities, by providing in *N.J.S.A.* 52:27D–302(h) that municipalities "are encouraged but not mandated to expend their own resources to help provide low and moderate income housing." Thus, *N.J.S.A.* 52:27D–311(d) can be reasonably construed simply to indicate that the authorization that *N.J.S.A.* 52:27D–302(h) provides for the direct expenditure of municipal revenues to provide affordable housing is purely voluntary and that any municipality that chooses not to make such expenditures cannot be compelled to do so.

Some municipal appellants argue that they cannot comply with their affordable housing obligations solely by zoning for inclusionary developments because they do not have sufficient vacant land

---

[6] We note that the Legislature amended the FHA in 2008 to prohibit regional contribution agreements, effective July 17, 2008, by the enactment of *N.J.S.A.* 52:27D–329.6. *L.* 2008, *c.* 46, § 12.

or sewer or water capacity for such developments and therefore the direct expenditure of municipal revenue represents the only means by which they can satisfy those obligations. However, any municipality in this position may petition COAH for an adjustment of its affordable housing obligations on that basis, *see N.J.A.C.* 5:97–5.6, and if the petition is denied, the municipality may seek review by this court.

For these reasons, the revised third round rules do not violate *N.J.S.A.* 52:27D–311(d).

15. *Rejecting Arguments that Third Round Rules were not Adopted in Conformity with Administrative Procedure Act*

Several appellants argue that the revised third round rules should be invalidated because they were not adopted in conformity with the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15.

The Twenty Municipalities, joined by various other municipalities, argue that the rules should be invalidated because COAH failed to prepare an adequate economic impact statement. Such a statement is required by *N.J.S.A.* 52:14B–4(a)(2), which provides that when a state agency gives notice of a proposed rule, it also must issue a statement containing various information, including "a description of the expected socio-economic impact of the rule." The Office of Administrative Law (OAL) has implemented this statutory requirement by adoption of an administrative rule, which requires an agency proposing adoption of a rule to provide "[a]n economic impact statement which describes the expected costs, revenues, and other economic impacts upon governmental bodies of the State, and particularly any segments of the public proposed to be regulated." *N.J.A.C.* 1:30–5.1(c)(3).

When COAH proposed the revised third round rules, it issued a socio-economic impact statement, which stated in part:

Approximately 40 percent of the population of New Jersey resides in what can be considered low or moderate income households. The benefit to these individuals, and to their communities, has been significant. While the municipalities involved

incur costs associated with the application of [COAH's] rules, such as professional fees required in the preparation of a Housing Element and Fair Share Plan prepared in accordance with [COAH's] rules, such costs may be defrayed through the collection of development fees. The proposed increase in the maximum development fee percentages and option for a tiered fee schedule will have a meaningful benefit in funding additional affordable housing that outweighs the costs. The maximum permitted residential development fee percentage has been increased from one percent of equalized assessed value to one and one-half percent. The maximum permitted non-residential development fee percentage has been increased from two percent of equalized assessed value to three percent.

Municipal inclusionary zoning ordinances are now required to offer a minimum financial incentive, in the form of a density bonus and one or more other financial incentives, which would offset the economic impact on developers. Standardizing of the maximum payment in lieu amounts charged to residential and non-residential developers and property owners throughout the State ensures that the amount charged realistically reflects the costs of subsidizing an affordable unit, which would have a positive economic impact for developers. Although not yet introduced, Legislation will be proposed to prohibit the imposition of an affordable housing requirement of payment in lieu of construction upon the non-residential sector, and instead impose a statewide development fee, which would have a positive impact on non-residential developers because the fees would be generally lower. In addition, applying the development fee uniformly throughout the State adds predictability and certainty to the process. The proposed standards could either have a positive or negative economic impact on the municipality, depending on whether the municipality's current established subsidy amount is greater than or less than the COAH established subsidy amount.

[40 *N.J.R.* 237(a), 240–41 (Jan. 22, 2008).]

The Director of the Office of Administrative Law accepted COAH's socio-economic impact statement for filing. *See N.J.S.A.* 52:14B–5(d)(3) ("filing of a certified copy of any rule shall be deemed to establish the rebuttable presumption that ... all requirements of [the APA] and of interagency rules of the director relative to such rule have been complied with").

Berlin argues that the third round rules must nevertheless be invalidated because COAH's socio-economic impact statement does not set forth the true costs of implementation of the rules. Relying upon a study conducted by the Office of Legislative Services, Berlin claims that the true cost of implementing the third round rules through the expiration of the third round period in 2018 will be $28.5 billion.

The essential purpose of the socio-economic impact statement mandated by *N.J.S.A.* 52:14B–4(a)(2) is to provide interested

parties with notice of the impacts anticipated by the agency proposing the rule. *See In re Coastal Permit Program Rules, supra,* 354 *N.J.Super.* at 364–65, 807 *A.*2d 198; *In re Prop. Disposition of a Casino Licensee,* 224 *N.J.Super.* 316, 324, 540 *A.*2d 523 (App.Div.1988). Such notice affords interested parties the opportunity to participate meaningfully in the rule-making process and to "inform[ ] regulators of possibly unanticipated dimensions of a contemplated rule." *In re Coastal Permit Program Rules, supra,* 354 *N.J.Super.* at 365, 807 *A.*2d 198 (quoting *Fed. Pac. Elec. Co. v. New Jersey Dep't of Env't Prot.,* 334 *N.J.Super.* 323, 340–41, 759 *A.*2d 851 (App.Div.2000)).

COAH's socio-economic statement accompanying the proposed revised third round rules satisfied the notice purpose of *N.J.S.A.* 52:14B–4(a)(2). There is nothing secret about the fact that compliance with affordable housing obligations may result in substantial costs to some municipalities. *See Mount Laurel II, supra,* 92 *N.J.* at 264–65, 456 *A.*2d 390. However, it is exceedingly difficult to predict these costs because they will vary from municipality to municipality depending not only on the magnitude of a municipality's affordable housing obligations but also whether the municipality chooses to comply with those obligations by means of inclusionary zoning, municipally subsidized affordable housing, or other means. Furthermore, because such costs are highly dependent on decisions made at the local level, individual municipalities are in a better position than COAH to estimate what these costs will be. Under these circumstances, COAH's socio-economic impact statement accompanying the proposed third round rules provided adequate notice to municipalities and other interested parties of COAH's views regarding the rules' expected economic impacts, which gave those parties an adequate opportunity to submit comments on the issue.

Berlin, joined by other municipalities, also argues that COAH violated the APA and the OAL's implementing rules by failing to give municipalities and other interested parties the data required to comment upon on the proposed third round rules a sufficient

time before the deadline for submission of such comments. This argument is directed solely at the parts of the rules dealing with the determination of prospective need based on the growth share methodology. We have previously invalidated those parts of the rules on substantive grounds. Therefore, there is no need to decide whether those rules also would be subject to invalidation on the basis of COAH's alleged failure to comply with the procedural requirements of the APA.

16. *Rejecting Twenty Municipalities' Argument Regarding Definition of "Prior Round Obligations"*

The Twenty Municipalities' brief challenges COAH's elimination in *N.J.A.C.* 5:97–2 of the word "remaining" from the definition of "prior round obligation" contained in *N.J.A.C.* 5:94–2.1(a). The Twenty Municipalities argue that municipalities will now be required to submit plans to satisfy the "entire," rather than just the "remaining," prior round obligations, which will allow "the reopening of any prior disputes with objectors that were resolved in a prior round substantive certification."

This argument is too abstract and hypothetical to be considered in the present facial challenge to the validity of the revised third round rules. COAH may not give the elimination of the word "remaining" the construction the Twenty Municipalities fear. Moreover, any attempt by an objector to relitigate a previously resolved dispute probably would be barred by the principles of collateral estoppel applicable to administrative proceedings. *See City of Hackensack v. Winner,* 82 *N.J.* 1, 32–33, 410 *A.*2d 1146 (1980). However, some actions taken by municipalities to comply with prior round obligations may never have been litigated or approved by COAH through the grant of substantive certification.

17. *Egg Harbor's Challenge to Validity of N.J.A.C. 5:97–5.8(a), Which Interprets 1,000–Unit Cap Upon Affordable Housing Obligations*

Egg Harbor Township argues that *N.J.A.C.* 5:97–5.8(a), which limits application of the 1,000–unit cap on affordable housing to a

municipality's growth share obligations, is inconsistent with *N.J.S.A.* 52:27D–307(e), which Egg Harbor argues must be construed to apply to a municipality's entire affordable housing obligation, including the parts attributable to present need and prior round obligations. Egg Harbor's aggregate third round affordable housing obligation is 2,033 residences, consisting of 100 present need units, 763 prior round obligation units, and 1,170 projected growth share units. We have previously invalidated the parts of the revised third round rules that determine prospective need based on a growth share methodology. Therefore, Egg Harbor's only current affordable housing obligations are 100 present need units and 763 prior round units, which is less than 1,000 total units. We cannot be sure that COAH will impose a prospective need obligation upon Egg Harbor on remand that will result in an aggregate obligation of more than 1,000 units. We also cannot be sure that COAH will readopt *N.J.A.C.* 5:97–5.8(a) or an equivalent rule. Therefore, the validity of *N.J.A.C.* 5:97–5.8(a) is not ripe for determination at this time.

### 18. *Credits for Publicly–Financed Affordable Housing Units*

The League of Municipalities argues that the revised third round rules improperly fail to give a credit against affordable housing obligations for publicly-financed affordable units. The League does not cite any specific rule in support of this argument, which is difficult to follow.

COAH responds that it has granted such credits in the past and will continue to grant credits against an individual municipality's affordable housing obligations for any publicly-financed affordable housing "prospectively built in the third round." Fair Share points out that COAH's policy, as reflected in the third round rules, of providing credits for publicly-financed affordable housing to the individual municipality in which they are constructed, rather than treating such housing as reducing statewide need, serves the public policy of encouraging municipalities to permit such developments.

We are satisfied that the League has not shown that COAH's policy is unreasonable or conflicts with the *Mount Laurel* doctrine. However, we suggest that COAH clarify this policy during the course of the remand ordered by this opinion.

19. *Rejecting Requests for Relief in Pending Law Division Actions*

Several appellants seek relief that goes beyond a determination of the validity of the revised third round rules. For example, Kings Row Homes and MTAE seek orders transferring actions they brought against Franklin and Franklin Township back from COAH to the Law Division. Such a request for relief is not properly before us in these appeals, which are limited to facial challenges to the validity of the revised third round rules. Instead, this relief should be sought in the pending Law Division actions.

20. *Rejecting Requests to Divest COAH of Responsibility for Adopting Third Round Rules and to Appoint a Master*

■■■ Kings Row, MTAE and ISP argue that in light of COAH's failure to adopt valid third round rules in a timely manner, this court should divest COAH of the authority to perform this statutory responsibility and adopt third round rules itself with the assistance of a master. Toms River, Brick and Jackson Townships present a similar argument, although they do not seek appointment of a master.

We rejected a similar request for relief in our prior opinion. *See* 390 *N.J.Super.* at 87–88, 914 *A.*2d 348. Although we have concluded that the parts of the revised rules that use a growth share methodology to calculate and allocate prospective need are invalid, there is no basis for us to conclude that COAH failed to make a good faith effort to adopt third round rules in conformity with our prior opinion. Furthermore, the mandate of this opinion for COAH's adoption of new revised third round rules is straightforward: determine prospective need by means of a methodology

similar to the methodologies used in the prior round rules. COAH should be able to comply with this mandate within five months without the assistance of a master or an army of outside consultants. Therefore, it would not be appropriate for this court to relieve COAH of its statutory responsibility to adopt valid third round rules.

21. *Conclusion: COAH is Directed to Adopt New Third Round Rules Within Five Months.*

In summary, we invalidate the parts of the revised third round rules that use a growth share methodology for determining the prospective need for affordable housing. We also conclude that the adoption of valid third round rules should not be further delayed by allowing COAH to adopt another methodology for determining prospective need that relies upon a growth share approach. Accordingly, we remand to COAH to adopt new third round rules that use a methodology for determining prospective need similar to the methodologies used in the first and second rounds. This determination should be made on the basis of the most up-to-date available data. The remand shall be completed within five months.

We also invalidate *N.J.A.C.* 5:97–3.2(a)(4)(iv), which authorizes a municipality to obtain substantive certification of a compliance plan that proposes to construct municipally-funded affordable housing without any specifics regarding the location of the site or source of funding; those parts of the third round rules that fail to provide sufficient incentives for the construction of inclusionary developments; *N.J.A.C.* 5:97–3.5, which governs rental bonuses for prior round obligations; and *N.J.A.C.* 5:97–3.18, which authorizes compliance bonuses for affordable housing units approved during the period from December 20, 2004 to June 2, 2008. Consequently, COAH must either eliminate or modify those parts of the third round rules in conformity with this opinion.

We affirm the other parts of the revised third round rules, including COAH's determinations of present need and prior round affordable housing obligations.

In view of the fact that more than ten years have now elapsed since expiration of the second round rules, and the widely varying circumstances of individual municipalities' compliance with their affordable housing obligations, including prior round obligations, we decline to issue a blanket stay of proceedings before COAH or in the courts pending completion of the remand to COAH. However, any municipality or other interested party may apply for a stay to COAH or the court in which a *Mount Laurel* case is pending. Any such application should be decided in light of the status of the individual municipality's compliance with its affordable housing obligations and all other relevant circumstances.